JAMES HAMMOND, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100456. Promulgated December 8, 1942.

*W. G. Boone, Esq.,* for the petitioner.
*Frank M. Thompson, Esq.,* for the respondent.

#### OPINION.

ARUNDELL, *Judge:* The Commissioner determined income tax deficiencies for the years 1935 and 1936 in the amounts of $8,006.35 and $151,204.84, respectively, together with penalties for the respective years of $400.32 and $7,560.24. Upon stipulation of the parties a decision was entered on October 2, 1940, that there was a deficiency in income tax of $2,561.85 and a penalty of $128.09 for the year 1935. We are presently concerned with the deficiency for 1936. The parties have stipulated that petitioner is not liable for the penalty, or any part of it, determined by respondent as to the year 1936.

The petition raised seven issues with respect to the year 1936. Six of them have been settled by stipulation, leaving the single question of whether petitioner's gain from the sale of certain stock may be reported on the installment basis. The facts are embodied in a stipulation, which is hereby adopted as our findings.

Petitioner, a resident of Germantown, Shelby County, Tennessee,

filed his return for the year 1936 upon the cash receipts and disbursements basis with the collector at Nashville, Tennessee.

In October 1936 petitioner sold all the stock that he owned in the Tennessee Co. (1,230 shares) for a total consideration of $965,000. The stock had no cost basis in his hands. An initial payment of $74,000 was paid during 1936. Petitioner contends that this sum was the only part of the purchase price received in 1936 and, since it was much less than 30 percent of the total selling price, that he is entitled to report the sale upon the installment basis. Respondent's position, however, is that by reason of the peculiar circumstances of the transaction petitioner actually or constructively received an additional amount of $430,000, or a total of $504,000, and, consequently, may not use the installment basis. It is stipulated that the difference of $461,000 between the total selling price of $965,000 and the amount of $504,000 is not taxable income to petitioner for 1936 but is income to petitioner as, when, and to the extent collected. Since the parties are agreed that the initial payment of $74,000 is taxable and that the balance of $461,000 is not, our attention is directed solely to the sum of $430,000 which respondent has determined was received by petitioner in 1936. For a clear understanding of the issue raised, it will be well at the outset to point out the relationships existing between the corporations and individuals involved.

The W. W. Hawkins Co., the Roy W. Howard Co., and the E. W. Scripps Co. are personal holding companies owning stock in various corporations which publish newspapers in different cities of the country. These personal holding companies, with others, exercise control of the various newspaper publishing corporations through a pooling of interests under a voluntary agreement known as the "Scripps-Howard Newspapers." H. E. Neave is treasurer of the central fund of the Scripps-Howard Newspapers, with offices in Cincinnati, Ohio. The E. W. Scripps Co. owns a majority of the stock of the Memphis Press-Scimitar Co., and the newspaper published by the latter is generally known as a Scripps-Howard newspaper.

In 1933 petitioner and the Hawkins Co. entered into an agreement whereby the Hawkins Co. was to organize a company to be known as the Tennessee Co., with an authorized capital of 3,000 shares of stock. The Tennessee Co. was to acquire all the stock of the Memphis Commercial Appeal, Inc., which at that time was owned by an outside company that was in receivership. The necessary funds were to be supplied by the Hawkins Co., and petitioner agreed to terminate his position as manager and publisher of the Detroit Times and to become publisher and general manager of the Memphis Commercial Appeal and president of the Memphis Commercial Appeal, Inc. Provision was also made for the transfer of some of the Tennessee Co. stock to

petitioner by the Hawkins Co. The agreement also provided that a contract would be executed by the Tennessee Co., Memphis Commercial Appeal, and Press-Scimitar, to the effect that Commercial Appeal would discontinue the publication of an evening paper and Press-Scimitar would refrain from publishing a morning paper in Memphis.

The Tennessee Co. was organized and it acquired the stock of Commercial Appeal. By a supplemental agreement the Howard Co. loaned funds to the Tennessee Co. Petitioner had become the owner of 51 percent (1,530 shares) of the Tennessee Co. stock by April 30, 1935. On that date a further agreement was executed by petitioner, the Howard Co., and the Hawkins Co. Under the terms of that agreement petitioner borrowed $250,000 from the Howard Co. for the purpose of paying his outstanding personal obligations. This loan was evidenced by eleven notes of $20,000 each and one note of $30,000, payable serially each three months, beginning August 1, 1935, with 6 percent interest. The notes were made payable to the order of H. E. Neave, trustee, or his successor, and petitioner pledged 1,230 shares of the Tennessee Co. stock as collateral. By the terms of the agreement petitioner sold to the Howard Co. 300 shares of the Tennessee Co. stock for a total consideration of $100. The agreement further provided that, if petitioner were unable for any cause to pay the principal or interest on any of the notes totaling $250,000 as they fell due, the Howard Co. would have the option to purchase petitioner's remaining 1,230 shares of Tennessee Co. stock at the price of $500,000, applying a part of such purchase price on the unpaid balance of the $250,000 loan.

On October 1, 1936, the balance due by petitioner to the Howard Co. was $150,000, represented by the last seven of the serial notes described above, maturing quarterly from November 1, 1936, to May 1, 1938, inclusive. An agreement was executed on October 1, 1936, by petitioner, Press-Scimitar, and the Howard Co. which recited that Press-Scimitar was the assignee of the Howard Co. under the contract of April 30, 1935, and that it desired to purchase and petitioner desired to sell all of his remaining 1,230 shares of Tennessee Co. stock. At that time petitioner was personally indebted to Commercial Appeal, Inc., all of the stock of which was owned by the Tennessee Co., in the amount of $280,000. The Howard Co. agreed to lend petitioner this amount in cash for the purpose of paying this debt. At the same time the Howard Co. canceled petitioner's seven notes remaining unpaid on the previous loan, and petitioner executed eleven new notes, the first in the amount of $30,000 and the other ten in the amount of $40,000 each, an aggregate of $430,000, equaling the total of the unpaid balance of the previous loan ($150,000) and the new loan ($280,000). The notes were payable on January 2 of each year from 1937 to 1947, inclusive, with 6 percent interest.

The selling price of the 1,230 shares of Tennessee Co. stock to Press-Scimitar was $965,000, payable as follows:

I. Amounts to be paid without interest ($535,000):
   a. $74,000 in cash on or before October 9, 1936;
   b. $66,000 in cash on April 1, 1937;
   c. $295,000 in ten installments on January 2 of the years 1938 to 1947, inclusive, the first installment in the amount of $43,000 and the rest in the amount of $28,000 each; and
   d. $10,000 on June 1 of the years 1938 to 1947, inclusive, if the net income of the Commercial Appeal, Inc. amounted to $250,000 each year or $2,500,000 for the ten-year period.
II. Amounts to be paid with interest ($430,000):
   a. $430,000 in 11 installments on January 2 of the years 1937 to 1947, inclusive, the first installment being $30,000 and the rest $40,000 each, with interest at 6 per cent per annum.

### The agreement provided as follows:

Hammond shall give Press-Scimitar, or its nominee to be selected by Press-Scimitar in its entire discretion, an irrevocable Power-of-Attorney * * * to receive and receipt for all payments to Hammond under this contract (except the initial payment of Seventy-Four Thousand ($74,000.00) Dollars) and to use the proceeds of the payments of interest and principal installments of said Four Hundred and Thirty Thousand ($430,000.00) Dollars to be paid Hammond over said eleven year period to make the interest and principal payments due on * * * notes * * * made by Hammond to the order of The Roy W. Howard Company, bearing interest at the rate of six (6%) percent per annum payable quarterly, * * * so that interest shall be paid on all of said notes as the same fall due out of the interest receipts on the unpaid principal balance of said total sum of Four Hundred and Thirty Thousand ($430,000.00) Dollars and so that the principal payments received and paid will be as shown on the following schedule:

| Paid on January 2 | Principal Payments to Hammond by Press-Scimitar | Principal Payments by Hammond to The Roy W. Howard Company | Paid on January 2 | Principal Payments to Hammond by Press-Scimitar | Principal Payments by Hammond to The Roy W. Howard Company |
|---|---|---|---|---|---|
| 1937 | $30,000.00 | $30,000.00 | 1944 | $40,000.00 | $40,000.00 |
| 1938 | 40,000.00 | 40,000.00 | 1945 | 40,000.00 | 40,000.00 |
| 1939 | 40,000.00 | 40,000.00 | 1946 | 40,000.00 | 40,000.00 |
| 1940 | 40,000.00 | 40,000.00 | 1947 | 40,000.00 | 40,000.00 |
| 1941 | 40,000.00 | 40,000.00 | | | |
| 1942 | 40,000.00 | 40,000.00 | Totals | $430,000.00 | $430,000.00 |
| 1943 | 40,000.00 | 40,000.00 | | | |

### The Howard Co. agreed as follows:

* * * The Roy W. Howard Company agrees that all payments of interest and principal on said notes made by Hammond to the order of The Roy W. Howard Company in the total sum of Four Hundred and Thirty Thousand ($430,000.00) Dollars shall be made out of funds received by Hammond's attorney-in-fact pursuant to paragraph (III) B hereunder, so that if the payments to be made to Hammond by the Press-Scimitar pursuant to said Paragraph (III) B are not made in accordance with the provisions of said paragraph (III) B then said Hammond shall not be liable on his said notes for Four Hundred and Thirty

Thousand ($430,000.00) Dollars to the extent such payments are not made by Press-Scimitar pursuant to said paragraph (III) B, but to the extent that payments to Hammond are made under said paragraph (III) B Hammond shall remain liable on his notes to The Roy W. Howard Company.

Paragraph II of the agreement provided that in consideration of the agreement of Press-Scimitar to purchase the 1,230 shares of stock and of the agreement of the Howard Co. that petitioner's notes to it of $430,000 "shall be paid only out of the payments to be made to Hammond by Press-Scimitar as stated * * *, said Hammond hereby agrees to and does hereby confirm and ratify his sale of three hundred (300) shares of stock in The Tennessee Company under said contract dated April 30, 1935, and agrees that said three hundred (300) shares of stock in The Tennessee Company are the property of The Roy W. Howard Company or its assigns." The agreement also provided that petitioner should have no right to assign or transfer any of his rights and/or obligations under the contract, it being agreed that there should be no anticipation of the payments to be made thereunder. Press-Scimitar and the Howard Co., however, reserved the right to assign or transfer their rights under the contract.

The agreement was carried into effect on October 9, 1936, as drawn. Petitioner executed an irrevocable power of attorney to Neave or his successor in office "to receive and receipt for all payments to be made to the undersigned by Memphis Press-Scimitar Company * * * excepting the initial payment of Seventy-Four Thousand ($74,000.00) Dollars * * *, and to use the proceeds of all payments to said Hammond or his said Attorney-In-Fact under said contract for the purposes and on the terms and conditions stated in said contract * * *." Petitioner received a check in the amount of $64,079.02 representing the balance due by Press-Scimitar on the initial payment of $74,000 (the difference between $74,000 and $64,079.02 is not in controversy here). The check was drawn to petitioner's order by Neave as treasurer of the central fund of the Scripps-Howard Newspapers. Petitioner received from the Howard Co. his canceled notes for the $150,000 balance of the previous loan and, in addition, two checks totaling $280,000 which he endorsed and delivered to Commercial Appeal, Inc., to satisfy his personal indebtedness. The checks were drawn to petitioner's order by Neave as treasurer of the central fund of the Scripps-Howard Newspapers. In return, petitioner delivered eleven notes aggregating $430,000 payable to the order of the Howard Co., each note reciting, however, that it was executed pursuant to and subject to the terms, conditions, and limitations of the contract of October 1, 1936. Petitioner also delivered the certificate for the 1,230 shares of Tennessee Co. stock to Press-Scimitar. Petitioner resigned as president of Commercial Appeal, Inc., as of September 30, 1936, and since then has had no further interest in any corporation or organiza-

tion connected with the Scripps-Howard Newspapers except, from October 1 to December 31, 1936, in an advisory capacity with the Commercial Appeal, Inc.

On January 2, 1937, Neave addressed a letter to petitioner, stating that an installment of $30,000 with 6 percent interest was due to petitioner from Press-Scimitar under the contract, and referring to the power of attorney under which this amount was to be used to pay one of petitioner's notes to the Howard Co. The letter contained the following:

Therefore, in accordance with the October 1, 1936 agreement and the Power of Attorney referred to, Memphis Press-Scimitar Company has today paid you the $30,000.00 installment on the purchase price of your stock due today, together with $6,450.00, being three months interest at 6% on $430,000.00 for the period October 1, 1936 to January 2, 1937, a total of $36,450.00.

I have received this $36,450.00 in your behalf and as your Agent and Attorney in Fact under your Power of Attorney, and in your behalf, have paid off your note dated October 1, 1936 maturing January 2, 1937 in favor of The Roy W. Howard Company, which said note I marked "Paid in Full," have cancelled and am returning to you herewith. I have also paid the quarterly interest on the total of $430,000.00 of notes executed by you under date of October 1, 1936 in favor of The Roy W. Howard Company, the amount of this interest being $6,450.00.

Thus, payments made for your account exactly equal the amounts received by me and credited to your account and there is no balance.

All payments provided for under the terms of the contract have been handled in the same manner as that outlined in the above letter. Petitioner reported on his returns for 1936, 1937, and 1938 the payments due and made by Press-Scimitar in each of those years in the manner provided in the contract. On January 24, 1939, by agreement between the parties to the contract of October 1, 1936, the obligations under said contract were settled by Press-Scimitar's payment to petitioner of $501,600 in cash and the delivery to him of four notes of the E. W. Scripps Co. aggregating $84,950; and by petitioner's payment to Press-Scimitar of the balance of his notes to the Howard Co. in the amount of $320,000, "which said notes have been endorsed to and are now held by Press-Scimitar." Press-Scimitar's payment to petitioner was made to Neave, and petitioner's payment to Press-Scimitar was made by Neave from such proceeds, and the balance was forwarded by Neave to petitioner. On his return for 1939 petitioner reported as gross profits the payments due and made on January 2, 1939, together with the gross cash receipts as the result of the agreement of January 24, 1939.

In the notice of deficiency respondent increased petitioner's reported net income for 1936 by the addition of "capital gain understated" in the amount of $252,459.98, with the explanation that the initial payment on the sale was: "Total cash received actually or

constructively (1936)," $504,000. Sixty percent of the gain is taxable under the provisions of 117 (a) of the Revenue Act of 1936. The parties have stipulated that "respondent has increased petitioner's income in the amount of $258,000.00." [1]

Section 44 (b) of the 1936 Revenue Act permits a taxpayer to use the installment method in case of the casual sale of personalty for a price exceeding $1,000 where the initial payments do not exceed 30 percent of the selling price. The term initial payments is defined as "the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made."

The crux of the problem is the effect of the triangular arrangement between petitioner, Press-Scimitar, and the Howard Co. Petitioner's argument may be summarized as follows: The agreement between himself and the Howard Co. was intended to, and did, in law and fact, create the relationship of debtor-creditor; the agreement was carried out precisely in accordance with its terms; Press-Scimitar neither assumed nor paid petitioner's debt to the Howard Co.; even if it had assumed petitioner's debt, he would be chargeable with income only as and when the assumed indebtedness was actually paid; and therefore petitioner received nothing more than $74,000 in the tax year as a result of the sale.

It may be supposed that if A sold property to B for $965,000, the latter paying $74,000 in cash and agreeing to pay the balance in stated installments during subsequent years, and if at the same time B "loaned" A an additional amount of $430,000, taking A's notes to mature coincidentally with installments due him, the understanding being that the notes would never be enforced against A, but that as installments and notes matured, the notes would simply be destroyed, a court would have little hesitancy in ignoring the idle form that the transaction took and in concluding that A had in fact received as his own the sum of $504,000. "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U. S. 609. In the case at bar, however, the loan was made by and the notes were payable to a corporation other than the purchaser of the stock. As a consequence, petitioner insists, the offsetting transactions must be regarded as separate and distinct and the corporate entities observed.

While most of the facts have been stipulated, there are certain matters as to which we are left to speculate. For example, it appears from one of the exhibits attached to the stipulation that prior to the ultimate settlement on January 24, 1939, petitioner's notes to the Howard Co. had been endorsed to and were held by Press-Scimitar, which

---

[1] We are unable to reconcile the two figures $258,000 and $252,459.98, but the parties have raised no question with respect thereto.

was petitioner's debtor. The stipulation does not show when this endorsement and transfer took place, and for aught we know it occurred in the tax year. In his letter to petitioner of January 2, 1937, Neave did not state that payment of petitioner's first note had been made to the original payee, the Howard Co., but merely that he had "paid off your note" and that he, Neave, had marked it paid and had canceled it.

If Press-Scimitar acquired petitioner's notes in the tax year, we have a case of a debtor owing himself. As such, the debt was discharged, for, as appears in section 451 of the Restatement of the Law of Contracts:

> § 451. Discharge of Duty by the Debtor's Acquisition of the Correlative Right.
> Where a person subject to a contractual duty, or to a duty to make compensation, acquires the correlative right in the same capacity in which he owes the duty, the duty is discharged.

See also Williston on Contracts (Rev. Ed.), vol. 6 § 1875J. Of course, if Press-Scimitar's duty and right were merged, petitioner's liability was extinguished.

We need not, however, rest our determination upon inferences or the failure of proof, for even if the Howard Co. had retained petitioner's notes until maturity, we think respondent's determination was correct. There can be no quarrel with the fundamental principle upon which petitioner relies, that Congress by section 44 has granted taxpayers the right to elect to sell property on the installment basis and thereby reduce their tax liability, even though they could have sold for immediate cash payment. If the vendor, however, receives cash *or property* other than the purchaser's evidences of indebtedness in excess of 30 percent of the selling price, the election is not available. Amount constructively received must be regarded as "property" other than evidences of the purchaser's indebtedness. Petitioner's assertion that the doctrine of constructive receipt does not apply is not borne out by the authorities. Thus, an amount received by an agent which the vendor is free to appropriate if he desires, *J. L. McInerney*, 29 B. T. A. 1; affd., 82 Fed. (2d) 665; or that is paid by the vendee to the vendor's creditor, *Wagegro Corporation*, 38 B. T. A. 1225, *Sterling* v. *Ham*, 3 Fed. Supp. 386; or the amount of the vendor's indebtedness that is canceled by the vendee, *W. H. Batcheller*, 19 B. T. A. 1050, must be included in the initial payments. It has also been decided, upholding the Commissioner's regulations, that the amount of a mortgage assumed by the vendee, in so far as it exceeds the vendor's cost or other basis, is a part of the initial payment received, even though no payments are made by the vendee on the assumed mortgage during the year of the sale and the vendor remains secondarily liable thereon. *Lucas* v. *Schneider*, 47 Fed. (2d) 1006; certiorari denied, 284 U. S. 622; *Metropolitan Properties Corporation*,

24 B. T. A. 220, 224; *Burnet* v. *S. & L. Building Corporation*, 288 U. S. 406. The court stated in the *Schneider* case that:

Contract rights stand high in the scale of property rights. The seller acquired the benefit of the purchaser's obligations, and there is nothing to indicate that it was worth less than the amount involved.

In the instant case petitioner maintains that his debt of $430,000 to the Howard Co. was neither paid nor forgiven in the tax year, and, since he remained liable for the debt, he was not in constructive receipt of income. We do not agree. Petitioner received the cancellation of the unpaid balance of his previous notes to the Howard Co., in the sum of $150,000, and $280,000 in cash from the Howard Co. In return he executed his notes for $430,000 to the Howard Co.; but each note contained a provision that it was executed subject to the terms, conditions, and limitations of the contract of October 1, 1936. One of those limitations was that the payee agreed that all payments should be made only out of funds paid by Press-Scimitar "so that if the payments to be made to Hammond by the Press-Scimitar * * * are not made * * * then said Hammond [the maker] shall not be liable * * *, but to the extent that payments to Hammond are made * * * Hammond shall remain liable * * *."

This latter so-called liability was a liability in name only, for other provisions of the contract precluded petitioner from personally receiving the payments from Press-Scimitar which were scheduled to go to pay his notes. Press-Scimitar was to pay itself or its nominee under an irrevocable power of attorney from petitioner and was forthwith under a duty to transmit the funds to the Howard Co. Thus, in no event could petitioner have been called upon personally to pay his notes in the amount of $430,000. If Press-Scimitar performed its obligations, the money would be delivered to the Howard Co. and petitioner's notes would be paid; if it did not, petitioner was specifically relieved of liability.

We think it unimportant that Press-Scimitar did not in so many words assume petitioner's debt to the Howard Co. or that the debt may not have been paid during the tax year. In so far as petitioner was concerned, it was immaterial whether Press-Scimitar made the payments specified in the contract or not. As to him the debt was canceled just as effectually as if there had been a novation between his creditor and debtor.

Nor are we impressed by petitioner's contention that payment to Neave was payment to petitioner since he was petitioner's agent "to act *solely* on petitioner's account." The contract required petitioner to execute an irrevocable power of attorney in favor of "Press-Scimitar or its nominee to be selected by Press-Scimitar in its entire discretion." Neave was Press-Scimitar's nominee. He acted for Press-Scimitar in drawing the check for the initial payment of $74,000 made

by Press-Scimitar; the loan from the Howard Co. took the form of checks drawn by Neave; and in his letter to petitioner of January 2, 1937, he stated that he, Neave, had marked one of petitioner's notes paid and had canceled it—functions which ordinarily are performed by the creditor. The inference is strong that the so-called payments by Press-Scimitar to Neave and by Neave to the Howard Co. were nothing more than bookkeeping entries made in the treasurer's office of the Scripps-Howard Newspapers. Furthermore, from the moment Press-Scimitar acquired petitioner's notes, we have Press-Scimitar owing petitioner and petitioner owing Press-Scimitar, but Press-Scimitar would make payment only to its nominee, Neave, and could collect only from Neave and then only from what it paid him. This serves to demonstrate how unreal petitioner's alleged liability was.

A decision adverse to petitioner is reached whether we regard petitioner as having received, as a result of the sale, funds with which to satisfy his debts, with no personal liability to repay, or, as alternatively suggested by respondent, whether the transaction is treated as an installment sale within the meaning of the statute with an immediate disposition by petitioner of the installment obligations received. If the latter view is taken, it seems clear that petitioner received a property or contract right in Press-Scimitar's promise to make future payments. Petitioner effectively disposed of that property right by relinquishing the possibility of securing the money himself and directing its payment to the Howard Co.; and the latter canceled petitioner's prior notes and advanced him additional funds, agreeing to look only to that property right for satisfaction of its loan, thereby accepting it in discharge of petitioner's personal liability. This case is less favorable to the taxpayer than *Thos. Goggan & Bro.*, 45 B. T. A. 218, and cases cited therein, where the gain realized upon disposition of installment obligations was required to be included within gross income even though the vendor remained secondarily liable in the event of default by the vendee. In the instant case petitioner not only received cash and a cancellation of outstanding notes on the strength of Press-Scimitar's installment promise, but he received in addition the assurance that the Howard Co. would never look to him personally, but only to the sums received pursuant to Press-Scimitar's promise, for payment.

It is plain that petitioner at once received the benefit of $504,000 as a result of the sale, and we accordingly affirm respondent's determination.

*Decision will entered under Rule 50.*