IVAN IRWIN, JR., AND ANN VANSTON IRWIN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1543–63—1545–63.  Filed March 17, 1966.

*Neil J. O'Brien* and *Jim A. Watson,* for the petitioners.
*Williard A. Herbert,* for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: Barney Vanston and Margaret Vanston, docket No. 1544–63; and Edmund F. Vanston and Jacqueline Vanston, docket No. 1545–63.

HOYT, *Judge:* Respondent determined the following deficiencies in petitioners' 1959 income taxes:

| Petitioners | Docket No. | Deficiency |
|---|---|---|
| Ivan Irwin, Jr., and Ann Vanston Irwin | 1543–63 | $11,401.45 |
| Barney Vanston and Margaret Vanston | 1544–63 | 56,707.98 |
| Edmund F. Vanston and Jacqueline Vanston | 1545–63 | 13,920.12 |

The sole issue for decision is whether upon a sale of their partnership business the petitioner-partners received payments in excess of 30 percent of the selling price in 1959, the year of sale, and are, therefore, precluded from using the installment method to report the income from the sale. The issues in docket No. 1544–63 with respect to the basis of the farm held by the partnership of Vanston, Hailey and Joy and the useful life of the rental building have been resolved by stipulation.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation of facts and exhibits referred to therein are incorporated herein by this reference. The copetitioners in each case, Ivan and Ann V. Irwin, Barney and Margaret Vanston, and Edmund F. and Jacqueline Vanston, are husbands and wives, all residing in Dallas, Tex. They timely filed their respective joint Federal income tax returns for the year 1959 with the district director of internal revenue at Dallas, Tex. All of the petitioners used the cash basis of accounting for the taxable year 1959.

Prior to May 1, 1959, Barney Vanston & Co., a general partnership, hereinafter referred to as the partnership, was owned by certain of the petitioners as follows:

Barney and Margaret Vanston _____ 70 percent
Edmund F. Vanston _____ 15 percent
Ann Vanston Irwin _____ 15 percent

Edmund F. Vanston and Ann Vanston Irwin are the children of Barney and Margaret Vanston. Petitioners Ivan Irwin and Jacqueline Vanston, son-in-law and daughter-in-law, respectively, of Barney and Margaret Vanston, are parties to this case solely by reason of having filed joint returns with their respective spouses. Hereinafter, references to "petitioners" shall be to the four petitioners who were partners in the partnership.

The partnership was in the business of conducting a managing general fire and casualty insurance agency. In conducting such a business the partnership did not itself sell insurance policies; it entered into agency agreements with large casualty insurance companies pursuant to which it represented these companies in developing and managing designated territories. The partnership located

local agents in the territory and the local agents in turn entered into agreements with the insurance companies (often through the partnership acting as agent for the companies) under which they were authorized to sell insurance for the companies.

The local agents sold insurance policies to the public and collected the premiums from the policyholders. After a local agent sold a policy and collected the premium, he retained his commission and remitted the balance of the premium to the partnership. The partnership, after receiving these remittances from local agents, deducted therefrom a small percentage as its commission, and then remitted the balance to the insurance company.

The partnership operated on the accrual basis of accounting. Upon receipt of the information from a local agent that a policy had been sold, the partnership made entries in its books debiting "Accounts Receivable, Agents" for the amount due from the local agent, crediting "Accounts Payable to Insurance Companies" for the amount due to the insurance companies, and crediting commission income for the amount the partnership was entitled to retain. In a typical transaction, where a policy was sold for a $100 premium and the local agent was entitled to a 20-percent commission, and the partnership to a 10-percent commission, the partnership would make the following entry upon learning of the sale by the local agent:

```
Accounts Receivable, Agents_____ $80
    Accounts Payable to Insurance companies_____      $70
    Commission Income_____          10
```

The parties have stipulated into evidence a managing general agent's agreement between the partnership and Ohio Farmers Indemnity Co. This agreement is stipulated as being typical of those which created the managing general agent relationship between the partnership and the various insurance companies which it represented. The stipulated agreement contains the following relevant paragraph:

V. The Managing General Agent shall remit to the Company for all balances not later than ninety (90) days after the close of the month in which the business was written. It is especially provided that before the close of the year all balances be paid to at least the end of September. *It further is understood and agreed that the Managing General Agent shall be responsible for collection and payment of all premiums due the Company, whether collected or not and whether collectible or not.* [Emphasis added.]

On its balance sheets the partnership showed the balance of Accounts Receivable, Agents, as an asset and the balance of Accounts Payable to Insurance Companies as a current liability. It also made use of a Reserve for Doubtful Accounts, which was shown as a reduction of total receivables.

During the early months of 1959 Barney Vanston entered into negotiations on behalf of the partnership with Kenneth Murchison and Kenneth Murchison, Jr., of Dallas, with a view to the sale of the partnership business to the Murchisons.

By document dated May 1, 1959, the petitioners assigned the entire partnership business to Barney Vanston & Co., Inc., a newly organized corporation, controlled by the Murchisons. None of the petitioners had any interest in this corporation at any time. Under the assignment agreement the purchaser agreed to pay the selling petitioners the sum of $471,539.64.[2] At the closing, the purchaser paid $81,539.64 in cash and delivered to the sellers promissory notes for the balance of $390,000. The cash and notes were distributed in accordance with the respective partnership interests as follows:

|  | Cash | Note | Total |
|---|---|---|---|
| Barney and Margaret Vanston | $63,884.33 | $273,000 | $336,884.33 |
| Edmund Vanston | 5,244.70 | 58,500 | 63,744.70 |
| Ann Vanston Irwin | 12,410.61 | 58,500 | 70,910.61 |
|  | 81,539.64 | [1] 390,000 | 471,539.64 |

[1] The amounts in this table were stipulated, as were the percentage ownership figures set forth at the beginning of our findings. The apparent discrepancy between percentage of total consideration allocated to each partner and each partner's stipulated percentage of "ownership" is not explained, but is of no moment

The notes were payable in monthly installments, with the first payment on each note due on January 1, 1960.

In the May 1, 1959, assignment contract, the purchaser acquired all of the assets of the partnership, and agreed to assume all of the partnership liabilities existing as of May 1, 1959. The assets conveyed had a book value and tax basis of $349,189.86. Constituting more than two-thirds of this total was the asset, Accounts Receivable, Agents, in the amount of $236,535.17. The liabilities assumed by the purchaser were as follows, as shown in the partnership balance sheet attached to the assignment contract:

Premium notes payable _____ $69,623.46
Accounts payable to insurance companies _____ 194,299.67
Accrued payroll taxes _____ 1,480.70
Notes payable (automobiles) _____ 3,596.51
Accounts payable (other) _____ 2,186.61

Total _____ 271,186.95

Constituting more than 70 percent of the total liabilities was the item "Accounts Payable to Insurance Companies," all due to be paid not later than 90 days after the "business was written."

[2] This total purchase price was based on book value of net assets (total assets in excess of liabilities) of $78,002.91, plus unrecorded goodwill valued at $393,536.73.

The purchaser made payments on these accounts during the remainder of 1959, and as of December 31, 1959, the balances remaining were as follows:

Premium notes payable_____ $30,777.51
Accounts payable to insurance companies_____ 0
Accrued payroll taxes_____ 0
Notes payable (automobiles)_____ 2,435.39
Accounts payable (other)_____ 0

33,212.90

Petitioners reported sales of their partnership interests in their respective joint returns for 1959 on the installment basis, calculated as summarized below:

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|
| Partners | Sales price | Basis in partnership interest | Net long-term capital gain | Percent of gain | Cash received in 1959 | 30 percent of sales price | Gain recognized in 1959 (col. 5×col. 6) |
| Ann V. Irwin_____ | $70,910.61 | $11,774.93 | $59,135.68 | 83.3947 | $12,410.61 | $21,273.18 | $10,349.79 |
| Barney and Margaret Vanston____ | 336,884.33 | 61,618.96 | 275,265.37 | 81.71 | 63,884.33 | 101,065.30 | 52,199.88 |
| Edmund Vanston__ | 63,744.70 | 4,609.02 | 59,135.68 | 92.77 | 5,244.70 | 19,123.41 | 4,865.51 |

As the above table indicates, petitioners regarded as payments received in the year of sale only the *cash* received by each from the purchaser at the closing of the sale in 1959. The cash so received was less than 30 percent of the selling price of the interests sold in all three docket numbers. Respondent determined as to all of the partners that the installment method could not be used because initial-year payments amounted to more than 30 percent of the selling price. Respondent determined that the entire amount of the long-term capital gain to each of the partners (column 4 in the above table) must be reported as income in 1959.

OPINION

In their petitions, the partners alleged that they sold their *partnership interests* to Barney Vanston & Co., Inc. (the Murchisons' corporation). In his answer to the petition in each case, respondent admitted this particular allegation. At the trial of the instant case, and subsequently, in both their original and reply briefs, petitioners took the revised position that what was sold was not *partnership interests*, but partnership assets.[3]

---

[3] The apparent reason for this revised approach is suggested in the case of *Andrew A. Monaghan*, 40 T.C. 680 (1963), acq. 1964–2 C.B. 6, relied upon rather heavily on brief by petitioners. In that case respondent determined that what was sold was an entire going business as a unit, and that payment in the year of sale exceeded 30 percent of the selling price of the entire business. Petitioner, however, successfully contended that the sale was not a unitary one, but several separate sales of business assets. The cash re-

Since this revised approach was at variance with the position alleged *and admitted* in the pleadings (that partnership interests were sold), petitioners, subsequent to submission of original and reply briefs by both sides, moved to amend their petitions to conform to the proof. The respondent filed objection to the motion and the matter was set for hearing. At the hearing, petitioners' counsel orally withdrew his motion to amend.[4] Hence, we regard it as settled by the pleadings and the record before us that the subjects of the sales here involved were partnership interests and not individual assets.

Section 453 of the 1954 Code permits the petitioners to report their gains from the sale of their partnership interests on the installment basis, but only if the payments (other than the purchasers' notes) received in the year of sale do not exceed 30 percent of the selling price. It is clear in the instant case that although all of the partners received some cash in the year of sale, none of them received cash in excess of 30 percent of his or her selling price. Respondent maintains that each partner's ratable share of the partnership liabilities assumed by the purchaser must be included as additional consideration received in the first year, and when these liabilities are so included the amount received in the first year by each partner far exceeds 30 percent of the selling price.

In stating flatly that a seller receives payment within the meaning of section 453 when the buyer *assumes* a debt of the seller, the respondent is not exactly correct. Obviously, the amount of a seller's liability assumed by the buyer must be included in the amount realized on the sale within the meaning of section 1001(b) for purposes of calculating the total gain or loss realized on the sale. *Smith* v. *Commissioner*, 324 F. 2d 725 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, and cases cited therein. However, this basic postulate has no necessary governing effect upon the question of year-of-sale payments for purposes of applying the 30-percent test of section 453. Although liabilities assumed are included in "amount realized" they need not necessarily also be regarded as "payments actually

ceived in the year of sale was applicable to only certain of the assets sold. Therefore, gain on these assets could not qualify under the 30-percent test. The rest of the assets, however, produced no cash in the year of sale, and, therefore, qualified for installment sale treatment. Similarly, petitioners here contended at trial and on brief that there had been separate sales of (a) goodwill (the principal asset sold) and (b) all the other assets, that the receipts in the year of sale were applicable only to the sale of tangible assets, and that nothing was received in the year of sale as to the separate contract for goodwill.

[4] Remarks of counsel at the hearing indicated that petitioners feared that if the transaction were viewed as a sale of assets rather than a sale of partnership interests, the respondent would take the position that the sale of goodwill (which accounted for the principal portion of the selling price of the business) gave rise to ordinary income. Under the original pleadings respondent did not challenge petitioners' treatment of the gain from the sale of *partnership interests* as entirely capital gain. Rather than face the possibility of having any of their gain taxed as ordinary income, petitioners' counsel elected to withdraw the motion to amend.

received" in the year of sale, bearing in mind the reason why section 453 makes a determination of year-of-sale payments necessary.

In a sale transaction involving deferred receipts of sales proceeds, even though all of the gain is *realized* at the time of sale, the seller may receive little or none of his selling price at that time; if the entire gain were taxed in that year he might well be faced with a substantial tax without having even a sufficient portion of the sales proceeds available to pay the tax. The Code's installment reporting privilege was designed to alleviate this potential hardship by spreading the tax over the periods in which sales proceeds are received. *Commissioner* v. *South Texas Lumber Company*, 333 U.S. 496, 503 (1948) ; *Thomas F. Prendergast, Executor*, 22 B.T.A. 1259 (1931). See Hearings Before the Committee on Ways and Means on Revenue Revision, 1925, 69th Cong., 1st Sess., p. 80; 2 Mertens, Law of Federal Income Taxation, sec. 15.01 (1961 rev.).

In order to limit the installment-reporting privilege to situations where the hardship is most acute, the present Code section is made applicable only when the seller receives payments that do not exceed 30 percent of his selling price in the year of sale, the year in which the taxable gain is realized. To balance the administrative inconvenience of permitting installment reporting in *all* cases with the hardship of not permitting it in acute cases, the line is drawn at 30 percent.[5] It may be said that Congress has recognized that if the seller receives 30 percent or more he has received enough to pay the tax without extreme hardship. Report of the Committee on Ways and Means on the Revenue Bill of 1934, H. Rept. No. 704, 73d Cong., 2d Sess., p. 24 (1934).

The theory which underlies the 30-percent test is as applicable to situations in which the seller is definitely and finally relieved of a personal liability as it is to situations in which the seller receives cash or other tangible property in the year of sale. Thus, if a buyer pays off a personal debt of the seller, this may be regarded as in effect the same as if the buyer had given the seller cash which the seller used to pay his own debt. It is true that the money paid to the third party creditor is not available to the seller to use in paying the tax on the gain realized on the sale, but by being relieved of a personal liability in this way, the seller's other personal funds (which otherwise might have been required to be used to satisfy personal debts), are freed to be used in paying the tax. This general principle was established in the installment sales cases at least as early as *W. H. Batcheller*, 19 B.T.A. 1050 (1930), in which it was held (pp. 1053–1054) that when

---

[5] The line was first drawn at 30 percent in sec. 44(b) of the Revenue Act of 1934, 48 Stat. 680, it having been previously fixed by statute at 25 percent and 40 percent. Sec. 212(d) of the Revenue Act of 1926, 44 Stat. 9; sec. 44(b) of the Revenue Act of 1928, 45 Stat. 791.

"the vendee, as part consideration for the property, cancels the vendor's prior indebtedness to him, the amount of the indebtedness so cancelled is income to the vendor and is the equivalent of cash."

This principle has been repeated several times. In *Wagegro Corporation*, 38 B.T.A. 1225 (1938), we held that payment of the seller's legal expenses of sale by the purchaser shortly after the transfer was to be regarded as a payment to the seller and part of the initial payments. In *James Hammond*, 1 T.C. 198 (1942), we held effective cancellation of notes of the seller running to a third party as part of the transaction of sale is to be regarded as a year-of-sale payment in the amount of the liability canceled. In I.T. 2351, VI–1 C.B. 43, it was announced that the amount of a mortgage on property which is sold to the mortgagee is to be regarded as part of initial-year payment since the mortgage is merged into the fee and thereby extinguished. In Rev. Rul. 60–52, 1960–1 C.B. 186, it was held that on sales of real estate, liabilities of the seller such as liens, accrued interest, and taxes which are assumed *and paid* by the purchaser of the property in the year of sale are to be included in year-of-sale payments for purposes of the 30-percent test.

It is important to note that all of the cases discussed above involve either a *cancellation* or a direct *payment* of the seller's liability so that the liability is *extinguished* in the year of sale. If the liability is merely assumed with an agreement to pay it at some future time, but it is not actually paid and finally extinguished in the year of sale the situation is not the same. In this event, unless there is a novation, cf. *Stephen A. Cisler, Jr.*, 39 T.C. 458, 465 (1962); *James Hammond, supra* at 206, the taxpayer-seller still remains ultimately liable, he is not finally and conclusively relieved of liability in the year of sale, and, technically, his personal net worth is not increased until the debt *is* finally extinguished by payment.

This distinction between *cancellation* and *payment* of the seller's debt on one hand and mere assumption of the debt on the other has been clearly recognized. In *Schneider* v. *Lucas*, an unreported case (W.D. Ky. 1929, 15 A.F.T.R. 572), reversed on other grounds 47 F. 2d 1006 (C.A. 6, 1931), certiorari denied 284 U.S. 622 (1931), it was held that a mortgage assumed, but on which no payments were made by the buyer during the year of sale, was not includable to any extent in determining initial-year payments. In *Katherine H. Watson*, 20 B.T.A. 270 (1930), the buyer of real estate from the taxpayer *assumed* liability for certain items of accrued interest, accrued taxes, paving liens, and other charges related to the property. We held that assumption of these liabilities was not part of initial-year payment since the evidence was clear that the assumed charges *were not paid* within the taxable year of sale. In *Estate of Henry R. Lipman* v. *United States*, 245 F. Supp. 393 (E.D. Tenn. 1965), the court held that the vendor received

no year-of-sale payments when as part of the consideration for the transaction the vendee agreed to "retire" *upon maturity* certain debts of the vendor's husband to the vendee. None of the subject debts from the husband to the vendee were to mature until after the year of sale, and these debts were not fully and finally canceled in the year of sale; they were canceled only upon later maturity.[6]

Hence, we recognize as an established general rule that if, as part of the consideration for a sale, a seller's liability is paid or canceled in the year of sale, the amount of the liability so extinguished is properly includable in year-of-sale payments, but if the liability is merely assumed (or the asset transferred "subject to" the liability) the liability is not necessarily deemed to be a year-of-sale payment. On the theory outlined, *supra*, we consider this dichotomous general rule to be in accord with the policy and rationale which underlie the installment reporting privilege and its presently existing 30-percent test.

In the instant case the purchaser of the partnership interests *assumed* partnership liabilities totaling $271,186.95. Of this total, $237,974.05 of the liabilities were paid and extinguished by the vendee subsequent to the transfer but within the taxable year of sale of the vendors. Thus, under the general rule set forth above $237,974.05 must be added to the cash received in 1959 by the partners from the vendee in determining the total payments received in the year of sale by all partners within the meaning of section 453. Attributing both partnership liabilities assumed (used in computing total selling price) and partnership liabilities paid by the vendee (used in computing year-of-sale payments) to each of the three partners in proportion to his or her percentage interest in the partnership, as the parties agree should be done, each of the partners must be deemed to have received in excess of 30 percent of his or her selling price in the year of sale.

Petitioners rely very heavily upon the following regulation under section 453 of the 1954 Code, section 1.453–4(c), Income Tax Regs.:

> *Determination of "selling price".* In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453–1 through 1.453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property.

Petitioners contend that the regulation establishes a general rule that assumption of liabilities by a purchaser can constitute year-of-sale

---

[6] The distinction between payment or cancellation of liabilities and mere assumption of liabilities has been recognized by at least two commentators, "Transferred debt in installment sale is increasingly a tax trap for sellers," 22 J. of Taxation 73 (Feb. 1965), and 2 Mertens, Law of Federal Income Taxation, sec. 15.18 (1961 rev.), and has been stressed by the Internal Revenue Service in its well known annual taxpayer guide, Your Federal Income Tax, I.R.S. Pub. No. 17, p. 104 (1966 ed.).

payments *only* if, and to the extent that, the liabilities assumed exceed the seller's basis in the property sold. Respondent, however, maintains that assumed liabilities are includable in year-of-sale payments here and that the regulation is specifically limited in its applicability to sales of mortgaged property where the buyer assumes or takes the property subject to the mortgage.

We cannot agree that this regulation applies as petitioner argues it should in the instant case, even in principle.

In the case before us not only was there no mortgage, but the liabilities assumed were short term, and in fact the vendee paid off most of them in the year of sale. We are convinced that the regulation should be read to apply only to liabilities which are *assumed but not paid* in the year of sale.

If the regulation is not so limited it would conflict with the principles announced by the cases discussed above, all of which were decided subsequent to the adoption of the regulation in 1926. Art. 44, Regs. 69. See *Lucas* v. *Schneider*, 47 F. 2d 1006, 1008 (C.A. 6, 1931). A holding here that the discharged liabilities are not to be included in year of-sale payments because they did not exceed the basis of the interests sold would conflict with the principles announced in *James Hammond* and *W. H. Batcheller*, both *supra*, in which we held that a canceled liability is to be regarded as year-of-sale payment. We would be in conflict also with the rationale of *Wagegro Corporation, supra*, which held that payment of the seller's expenses of sale was to be included in initial payments. None of these cases appears to consider the regulation relevant to limit year-of-sale payments to the excess of liabilities assumed and paid over basis.

Prior to its amendment in 1929, article 44, Regs. 69, provided in pertinent part as follows:

> In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall not be considered as a part of the "initial payments" or of the "total contract price" but shall be included as part of the "purchase price" as those terms are used in section 212(d), in articles 42 and 45, and in this article. * * *

The 1929 amendment (see T.D. 4255, VIII-1 C.B. 165) which changed the regulation so as to include a portion of the assumed liability in "initial payments" when the mortgage exceeded basis in the asset sold was adopted for a special technical purpose.[7] Thus, the general rule concerning "initial payments" had to be modified slightly in order to accommodate (and solely as a byproduct of) a technical change related to the gross profit percent. There was no intention to change the general rule that initial payments should not include

---

[7] Apparently this change was necessary to avoid having a gross profit percent which would be greater than 100 percent.

liabilities assumed but not paid or to extend the concept of initial payments to include therein assumed liabilities not discharged in the year of sale.

Therefore, as we see it, the regulation in its present form, insofar as it affects the 30-percent test and the determination of year-of-sale payments, is a *disadvantage* rather than an advantage to the taxpayer. That is to say, it will in some cases include in "initial payments" portions of assumed liabilities which would not have been included therein under the preamendment regulation. All that the regulation, as amended, accomplishes is to insure that the "selling price" includes any mortgage assumed and that year-of-sale payments and total contract price do not include assumed mortgages except to the extent that they exceed the vendor's basis in the property sold. A detailed discussion of the purposes, objectives, and application of the regulation may be found in *Stonecrest Corporation*, 24 T.C. 659, 665 (1955).

Petitioners in the instant case argue that the regulation *should* be applied to the transaction before us, not to increase year-of-sale payments by the amount that assumed liabilities exceed their basis, but to exclude therefrom liabilities assumed and paid to the extent that they do not exceed basis. This unusual posture results from two erroneous views of the law: (1) Petitioners apparently believe that but for the regulation, assumed liabilities are included in initial payments whether or not they are paid or otherwise discharged by the purchaser in the year of sale, and (2) petitioners fail to realize that if the liabilities assumed are also paid off in the year of sale, they are includable in year-of-sale payments to the extent that they are discharged. The principles announced in the line of cases discussed above makes this clear.

We hold that all of the liabilities, totaling $237,974.05, assumed *and paid* by the vendee in the instant case in 1959 are to be regarded as payments received by petitioners (according to their respective interests) in the year of sale. This being the case, each of the petitioners received more than 30 percent of his selling price in the year of sale and therefore may not report the gain realized that year on the installment method. The provisions of section 453 have not been met and respondent's determination must be sustained.

Because of our holding that liabilities assumed and paid in the year of sale are to be included in year-of-sale payments within the meaning of section 453(b)(2), we need not discuss the question whether the regulation relied on by petitioners extends to nonmortgage liabilities.

Petitioners also rely upon *Marshall* v. *United States*, 241 F. Supp. 30 (S.D. Calif. 1964), a recent District Court case now on appeal in the Ninth Circuit. The controversy in *Marshall* centered around whether or not section 1.453-4(c), Income Tax Regs., could be extended

beyond mortgage liabilities to unsecured business liabilities. In focusing upon this question the court failed to consider the fact that most of the assumed liabilities were paid off by the purchaser in the year of sale. In failing to note that fact, and in deciding the case for the taxpayer, the case is in conflict with *W. H. Batcheller, supra,* and the rationale of the other cases discussed above. The respondent's determination that petitioners are not entitled to report their gains on the installment basis are accordingly upheld.

Reviewed by the Court.

> *Decisions will be entered for the respondent in docket Nos. 1543–63 and 1545–63.*
>
> *Decision will be entered under Rule 50 in docket No. 1544–63.*

TANNENWALD, J., dissents.