J. W. McWILLIAMS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14977, 25979.   Promulgated February 12, 1929.

*George E. H. Goodner, Esq.*, and *Walter K. Smith*, C. P. A., for the petitioner.

*Harold Allen, Esq.*, and *W. R. Lansford, Esq.*, for the respondent.

336

[redacted]

OPINION.

TRUSSELL: The various issues herein will be discussed and disposed of in the order in which they are above set out.

In respect to petitioner's contention that the net profits of a partnership in which he held an interest were erroneously increased by respondent for the years 1920 and 1921 by disallowance of depletion on timber, thereby increasing the amount reported by him as his distributive share of such profits, the record shows that the partnership in question was the owner of certain timber rights in two tracts of land, the first, containing 26,667,000 feet, having been acquired in 1918 at a cost of $160,000, or $6 per thousand feet, and the other, containing 40,000,000 feet, having been acquired in 1919 at a cost of $280,000, or $7 per thousand feet. In addition the partnership in 1920 bought 87,223 feet of timber for $916.34 and in 1921 bought 28,701 feet of timber for $455.92. All of the timber cut in

the years 1919 and 1920 was from the first tract purchased at $6 per thousand, but in computing its allowance for depletion for those years the partnership used various rates estimated to be present value or cost of replacement of the timber cut and in excess of cost. For the year 1921 the timber cut was from all of the timber holdings mentioned, but though the total cut is shown to be 9,179,519 feet, there is no evidence as to the amount cut from each of the tracts.

The action of respondent in limiting the depletion allowance for the year 1920 to $6 per thousand feet of timber cut is approved by us, as all timber cut in that year was acquired at that price. For the year 1921, however, the timber cut was from all of the tracts and the correct depletion rate is the average of the cost per thousand feet of all of the timber remaining uncut at the beginning of that year. A reasonable rate for 1921 is computed as follows:

| | Feet | Cost |
|---|---|---|
| Remaining from first tract, at $6 | 6, 724, 802 | $40, 348. 81 |
| Remaining from second tract, at $7 | 40, 000, 000 | 280, 000. 00 |
| Small 1920 tracts | 87, 223 | 916. 34 |
| Small 1921 tracts | 28, 701 | 455. 92 |
| | 46, 840, 726 | 321, 721. 07 |
| Less certain down timber sold for | | 1, 000. 00 |
| | | 320, 721. 07 |
| Average cost and depletion rate per M feet for 1921 | | 6. 84 |

In computing the net income of the partnership for the years 1920 and 1921 the rates above given should be used to arrive at depletion allowances for timber cut. Any amounts by which the depletion as charged off by the partnership for those years exceeds the amounts so computed should be restored to the asset account of timber remaining.

As to the deduction of repair expense to the plant for the year 1920, the record shows $10,000 of the amount so charged by the partnership was disallowed by respondent on the ground that to that extent the expenditures involved were capital in character. Upon the hearing petitioner withdrew this assignment of error and agreed to the disallowance, with the understanding that the amount so disallowed should be restored to capital and this respondent agreed was proper. The action of respondent with respect to this disallowance is sustained and capital should be adjusted accordingly.

Early in the year 1920 the petitioner turned over to the partnership for its use in the business a new Buick automobile which he had purchased from personal funds. This automobile was used by the partnership for business purposes during 1920 and 1921, and near the close of the latter year it had become damaged from wear and tear and was turned in by the partnership for a new car, and the

difference in value, $1,375, was paid in cash by the partnership and the new car returned to petitioner. The partnership deducted as an expense of 1921 the sum of $1,375 paid. The payment in question was not a capital transaction. The partnership obtained nothing of asset character for it. The automobile turned in was the property of petitioner and not the partnership and the $1,375 paid represented merely the exhaustion in value by wear and tear in use by the partnership. Had the latter returned the car to petitioner and paid him the $1,375 to compensate for the wear and tear, it would unquestionably represent a normal business expense, and we can see in the transaction as carried out nothing more than a method used to effect the same result. We hold that the payment in question is a business expense. It is a proper deduction for the year 1921 in which paid. *Wm. J. Ostheimer*, 1 B. T. A. 18; *Thatcher Medicine Co.*, 3 B. T. A. 154; *Richmond Light & Railroad Co.*, 4 B. T. A. 91; *Husch Bros., Inc.*, 6 B. T. A. 1056.

For 1920 and 1921 the partnership charged off no depreciation on its plant and respondent in determining the deficiencies appealed from allowed none. Petitioner now asks that allowance be made for reasonable depreciation for those years in determining the net profits of the partnership and his correct distributive shares of same. On the hearing petitioner testified that the action of the partnership in failing to charge depreciation was due to the fact that they had expended large amounts in 1920 on the property and had taken credit for all of this as expense. Now the respondent has disallowed $10,000 of the expenditures taken credit for as expenses, and petitioner asks that allowance be made for depreciation.

We have found that the physical life of the mill and plant was 10 years. This is testified to by petitioner, who has qualified sufficiently as a lumber-mill expert. This evidence was not contradicted and is to some extent supported by the proof in the record that this plant was built for the specific purpose of operating this tract of timber alone, no other tracts in reach being then available. At the rate of operation in the three years in evidence the timber would be exhausted in less than 10 years from the beginning of operations, and the building of a permanent or long-lived plant would have been useless. We accept the testimony of petitioner that under these conditions the plant erected was one with a 10-year life.

Petitioner insists that the life of the plant, however, should be considered as 6½ years, with a 10 per cent salvage value at the end of that time as the timber available would then be exhausted. This theory assumes that continued operation of the plant would be at the same rate as in the years before us, and we can not assume that such would be the case. The additional loss of value asked on this

theory is one due to obsolescence, and no facts are shown indicating that such loss has yet accrued. We can not say that the plant will not operate its full 10 years of life. Market conditions may operate to curtail production or conditions may change whereby other timber adjoining, and belonging to other operators, may become available. We hold an allowance of 10 per cent for depreciation for the years 1920 and 1921 to be reasonable and proper.

Petitioner's second assignment of error is upon the inclusion in his income for 1921 of the entire profits of the partnership for that year when he owned only a seven-eighths interest prior to November 30, 1921. The additional one-eighth interest which he purchased on that date included the profits accrued on the same for that year and he contends that such profits were acquired in a capital transaction and consequently did not represent income.

With this view we agree. It can not be questioned that the undrawn profits accrued upon the one-eighth interest acquired by petitioner on November 30, 1921, constituted one of the things of value for which the sum of $21,000 was paid. The partnership stood dissolved on that date and one-eighth of the profit then earned and distributive to Pearson was acquired by petitioner as an item of the interest of Pearson purchased by him. This profit was income taxable to Pearson for that year and not to petitioner. *Ella Daly King,* 10 B. T. A. 698; *Ormsby McKnight Mitchel,* 1 B. T. A. 143; *Alfred Le Blanc,* 7 B. T. A. 256; *Samuel V. Woods,* 5 B. T. A. 413.

Petitioner's taxable distributive share of the partnership income for the calendar year 1921 is seven-eighths of the net profits plus one-twelfth of the remaining one-eighth share, the sale of that share having been on November 30, and the books being closed and total income computed on December 31, 1921.

Petitioner for the year 1921 reported a total profit upon the sale of the partnership assets to Cowan in the sum of $61,551.51 and returned as income for that year 31.13 per cent of that amount, or $19,160.98, as the proportion of such profit received in that year, treating the sale as one on the installment basis. Respondent increased the total profit to $180,074.82 by the computation set out in the findings, and treated all of such profit as income of the year 1921.

An examination of respondent's computation of petitioner's net taxable income for the year 1921 shows that he has computed a net loss of $39,535.47 upon the dissolution of the partnership by petitioner's acquisition of the Pearson one-eighth interest, as realized by petitioner at that time, and has credited this upon a total gain computed upon the subsequent sale of the partnership assets. The loss upon dissolution he has computed as the difference between the cost to petitioner of the partnership assets and their net book cost as of

the date of dissolution. The gain on the sale of these assets he has computed as the difference between the price received by petitioner and the net book cost of the assets.

This computation overlooks the fact that in the acquisition of the one-eighth interest of Pearson by petitioner and the dissolution of the partnership there was no loss realized by petitioner. This transaction merely resulted in his acquisition of certain assets. No gain or loss was realized by him until his sale of these assets two weeks later and the basis for its determination is not the book cost of the assets, which is the cost to the partnership, but their cost to petitioner, as the sale was one by him and not by the partnership. Respondent has determined a cost of the assets to petitioner as follows:

| | |
|---|---:|
| J. W. McWilliams' original investment | $25,000.00 |
| Wells' capital account transferred | 10,000.00 |
| Excess paid Wells over and above his personal account | 13,035.47 |
| Paid Pearson for his interest | 21,000.00 |
| Paid Slater for share of profits | 10,500.00 |
| J. W. McWilliams' personal a/c, including accumulated profits, undrawn salary, net additional money paid to partnership, and corrected profit for 1921 of $38,913.80 | 182,776.87 |
| Total cost to McWilliams | 262,312.34 |

The item "Paid to Slater, $10,500," in the above computation is not explained in the record and we do not know the particular circumstances of the transaction, but it is included by respondent and is not questioned and we accept it as a correct item of cost. The other items included in the total cost are correct with exception of the last one, "J. W. McWilliams Personal Account—$182,776.87." This total is the one shown by the books with one adjustment only, the addition of the sum of $1,375, representing an item of automobile expense disallowed for 1921 and increasing to that extent the total profit for that year. We have held that this was a proper item of expense and should be allowed. It is noted also that although respondent has increased by his determination the income of petitioner for 1920 in the sum of $20,404.17 and for 1921 in the sum of $15,000, as additional profit from the partnership resulting from his disallowance of a repair expense and depletion for those years, no corresponding adjustment has been made of the book net profit of the partnership as carried into petitioner's personal account representing profits distributive to him in those years. The adjustments on account of depreciation, depletion and expense for the taxable years 1920 and 1921 as heretofore directed by us should be made and these adjustments should be carried through and reflected by a correction of net income of the partnership for those years and by a corresponding correction of the book balance in petitioner's personal account as of December 31, 1921.

The record shows furthermore that for the year 1919 the partnership deducted depletion at various rates upon the timber cut and depreciation upon its other assets at rates in excess of 10 per cent. We have found that the correct rate for depletion for that year was $6 per thousand feet of timber cut, and also the amount cut, and that the correct rate for depreciation was 10 per cent. These asset accounts should be adjusted by applying these rates and this adjustment reflected by correction of the profit and loss account and petitioner's personal account for that year and such adjustment reflected in the latter account as of December 31, 1921.

The gain realized by petitioner in the sale of the partnership assets is the sum of $390,000, received by him, less the cost to him of those assets as computed above with the adjustments directed and with such cost diminished by the $11,000 cash retained.

Section 212(d) of the Revenue Act of 1926, which is provided by section 1208 of that Act to be retroactively applied in computing income for the taxable year 1921, reads as follows:

Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000 or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the Commissioner, with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

In articles 42 to 46, inclusive, of Regulations 69, the Commissioner has promulgated rules for the enforcement of the section of the statute above quoted. By article 44 the meaning of "total contract price" and "purchase price" as used in the statute is defined as follows:

* * * In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall not be considered as a part of the "initial payments" or of the "total contract price" but shall be included as part of the "purchase price" as those terms are used in section 212(d), in articles 42 and 45, and in this article. * * *

In the case before us the unpaid indebtedness of the seller in respect to the property, payment of which was specifically assumed by the purchaser, was not secured by mortgage but in all other respects was similar to a purchase money debt so secured. The seller in the trans-

action before us had acquired this property under a contract of purchase which obligated him to pay a stated amount and the party from whom it was acquired retained title under that contract until the payments called for should be all made as provided instead of conveying title and then receiving back the legal title under a mortgage executed to secure the indebtedness. Such a transaction we have held is a sale and purchase of property as of the date of the contract. *Pacheco Creek Orchard Co.*, 12 B. T. A. 1358; *Pacific Coast Redwood Co.*, 5 B. T. A. 423; *J. T. Pittard*, 5 B. T. A. 929. The partnership of McWilliams & Pearson, the purchaser under this contract, and petitioner, who had succeeded to its interest, had paid all of the purchase price of $440,000, with the exception of $130,000 at the time of the resale in 1921 under which the purchaser from this petitioner specifically assumed the payment of this unpaid balance.

In determining whether or not this last sale was one on the installment basis we see no difference between the assumption by the purchaser of the contract obligation of the seller to pay a former owner a balance of $130,000 due upon the property, and his assumption of a mortgage due that party and representing that item and we have in *Dalriada Realty Co.*, 5 B. T. A. 905, and *Pacheco Creek Orchard Co.*, *supra*, accepted the construction placed upon section 212(d) by article 44 of Regulations 69 in so far as that regulation defines the meaning of "total contract price" and "purchase price" as used in that section, in respect to a transaction of this character.

It follows that the "purchase price" of this property under the transaction before us includes the obligation assumed to make payment to one other than the seller of an indebtedness of $130,000 on the property and is the gross amount for which the purchaser obligates himself, or $520,000. Of this sum the only amount agreed to be paid, or which was paid in 1921, the year of sale, was $125,000, or less than 25 per cent, and in accordance with section 212(d) above quoted, petitioner is entitled to return the income from the transaction on the installment basis, the percentage of the profit to be returned as income for each of the years in question to be determined upon the basis of the. purchase price less the $130,000 of indebtedness assumed, or $390,000.

Petitioner insists that his tax liability for the calendar years 1922 and 1923, on income received in those years representing profits on the sale of the partnership assets in 1921 to Cowan, should be computed under section 206 of the Revenue Act of 1921, instead of under sections 210 and 211 of that Act. Section 206 referred to applies to income represented by capital gain and this is defined by that section as "taxable gain from the sale or exchange of capital assets consummated after December 31, 1921." The term "capital assets" is by

that section defined as "property acquired and held by the taxpayer for profit or investment for more than two years." There is no evidence that the sale of the partnership assets was consummated after December 31, 1921. The contract of sale was executed, the cash payment was made and deferred payment notes were given in that month. We accordingly hold that petitioner is not entitled to have his tax on profits received in 1922 and 1923 from the sale of these assets computed under section 206 of the Revenue Act of 1921.

During the calendar years 1920 to 1924, inclusive, and for the first two months of 1925, petitioner was the sole owner of a lumber sales business operating under the name of the J. W. McWilliams Lumber Co. This business was entirely separate and distinct from the partnership of McWilliams & Pearson. Early in the year 1920 petitioner turned over to this lumber business two Cadillac automobiles purchased by him at a cost of $4,000 each. One of these cars was new and the other practically new. These cars were thereafter used exclusively in this business by the lumber buyers and representatives employed by petitioner in traveling for the business. The cars sustained very rough usage over bad roads. In 1922 these cars were traded in for new Buick cars, the business of J. W. McWilliams Lumber Co. paying in addition for the new cars the sum of $1,413.70. In 1923 these Buick cars were traded in for new ones, the business paying a difference of $3,023.55. Subsequently, by other trades, without additional cash payments, the business became the owner of one Buick car in place of two, and upon the liquidation of the business in March, 1925, this car was taken by petitioner and sold for $1,500. Petitioner deducted, as depreciation on automobiles, $1,413.70 for 1922, and $3,023.55 for 1923, these being the amounts paid out in those years on the trades whereby new cars were obtained. These deductions were disallowed by respondent on the ground that they were capital expenditures and depreciation was allowed by him for 1922 and 1923, on the basis of a life of six years, on the amount of these two expenditures. No depreciation was allowed on the cost of the two Cadillac cars turned over to the business in 1920.

The business of J. W. McWilliams Lumber Co. from 1920 to 1923, inclusive, was a sole proprietorship. It had no identity separate from petitioner. The record shows that beginning early in 1920 petitioner used exclusively for business purposes two automobiles which he had purchased. It follows that actual depreciation sustained upon these automobiles as a result of this business use, if it can be determined, is a proper deduction from gross income as wear and tear on assets used in trade or business.

The record shows the original cost of these automobiles to have been $4,000 each, and that one was new and one "practically new" at the time assigned exclusively to business use. Additional amounts

were expended in 1922 and 1923 in cash payments made on occasions when old cars were traded in for new. The total sum of the depreciated cost of the two Cadillac cars at the time taken over for business use and the later expenditures of $1,413.70 and $3,023.55 represent the capital cost of these assets depreciable over the life of their use in the business.

The $1,500 for which the last remaining car was sold represents the portion of that capital cost not exhausted by such use. One of the Cadillac cars at the time taken over by the business was new and should be included at its full cost of $4,000. The other, it was testified, was "almost new" and although such description for purposes of determining value is rather general, it indicates that although it had sustained some use it had not depreciated to any marked degree. We consider that such testimony was sufficient to show that it had not depreciated in excess of 25 per cent of cost. If it had in fact not depreciated to this extent our inability to arrive at a depreciated cost in excess of $3,000 is due to lack of evidence to determine the exact amount and the burden of making such proof is upon petitioner. We accordingly determine that these two cars should be included at $4,000 and $3,000, respectively, and that these sums plus the additional expenditures of $1,413.70 and $3,023.55, or a total of $11,437.25, represent the capital cost of these depreciable assets used in the business, and that this total, less $1,500 received for the remaining car in 1925, or $9,937.25, represents the exhaustion of these assets during the years 1920 to 1924, inclusive, and the first two months of 1925. In the absence of evidence as to just when the exchanges of cars were effected and the details of those transactions, we hold that the total of this exhaustion should be apportioned ratably over such period, or $1,923.34 to each of the years 1920 to 1924, involved herein. For each of the years 1920 to 1923, inclusive, petitioner is entitled to deduct the amount of $1,923.34 determined as a reasonable allowance with respect to these assets, but for the year 1924 a different condition is shown to exist, as a one-half interest in the business of J. W. McWilliams Lumber Co. was sold by him on April 1 of that year to one Sinks and the depreciation sustained thereafter on these assets was not the subject of a deduction by petitioner, but by the partnership, in determining the net income of the business distributable to petitioner and Sinks. We accordingly hold that petitioner, individually, is entitled to deduct for the year 1924 only three-twelfths of the total exhaustion of $1,923.34 sustained by these assets during that year.

For the years 1922, 1923, and 1924, petitioner, in arriving at the net income reported on his returns, deducted $7,637.71, $11,100, and $4,923 as expenses incurred by himself and several employees in

traveling for the business of J. W. McWilliams Lumber Co., paid by them and for which they were reimbursed by the business in those years. These deductions were disallowed ·by respondent on the ground that the evidence was insufficient to show that the items making up these totals were actually payments made to reimburse for travel expenses paid. These total amounts deducted for 1922 and 1923 are made up of items appearing on the books of J. W. McWilliams Lumber Co., for those years as payments made and charged to general expense, and credits entered on the books to the personal account of petitioner and charged to general expense. The books for those years are in evidence. The amount deducted for the year 1924 is testified to have been similarly recorded in the books for 1924, and the return for that year to have been made up from those books, but the books are not in evidence, except a check register covering payments made. The other books it is testified are lost. The book evidence of these items for 1922 and 1923 and their character is accordingly limited to their amounts, the parties to whom paid or credited, and the fact that they were charged to general expense, and for 1924 to certain payments made to individuals and firms, and these are testified to by petitioner to be traveling expenses. The individual travel expenses of petitioner for 1924, not being paid to him as such, but merely credited to his personal account against which his occasional withdrawals were charged, are not shown separately by this check register.

The petitioner at the hearing identified the items, other than credits entered to his personal account, as items of travel expense of employees. These amounts, he testified, were not payments of salary and he could positively identify them as reimbursements of travel expense. In respect to the items for 1922 and 1923 credited to his personal account and charged to expense on the books, and as to the balance of the amount for which credit was asked for 1924, over and above the amount shown by the check register, petitioner testified that he traveled for the business, spending nearly all of his time in this way, and visited many of the larger cities obtaining orders for lumber, and that his customers were mainly the large corporations. He stated that he kept pocket memoranda of his expenses of travel and on his return from trips would merely advise the bookkeeper as to the total amount of his expense as shown by such memoranda, and this amount was thereupon credited to his personal account, against which all his withdrawals were charged. He was unable to produce any expense account, stating that all of these were destroyed or discarded as he saw no necessity of keeping them and that he filed no regular itemized expense account, as· the business belonged to him

alone, and he saw no reason for furnishing one to his bookkeeper. He testified that all of the items credited to him and charged to expense in the years in question represented reimbursement for expenses of travel by him for the business and which he had paid.

We can see nothing unreasonable in the testimony given. The system of the business in respect to a detail record of expenses of this character, at the most, appears to have been careless, but when we consider that it was for most of the time a sole proprietorship, the failure of petitioner to submit a detailed expense account to his bookkeeper or to keep his personal memoranda of expense, after it had served its purpose of supplying the information on which he was credited with the amount, carries no peculiar significance discrediting the positive testimony given that the amounts paid or credited represented traveling expenses of the business. The total amounts for the several years do not appear excessive. Petitioner spent nearly all of his time in traveling for the business, visiting many of the large cities, and, in addition, employed several men whose duties entailed travel. The largest amount, $11,100, is for the year 1923, and as to that year the record shows that included in this amount is the cost of a three-month trip by petitioner to San Domingo, investigating timber properties, on which he took one man from Mobile, and employed guides, helpers and a pack train in that country.

We think the proof sufficient as to the expenditures for travel for the business in the three years in question and that petitioner is entitled to the deductions asked for 1922 and 1923. However, as to 1924, a different condition exists, because of the sale of an interest in the business on April 1 of that year. Prior to that time the business was a sole proprietorship. Its business identity was that of the petitioner. Its expense was his expense. The record indicates that the deduction taken by petitioner for 1924 of $4,923 as traveling expenses is the total expense of that character incurred by the business of J. W. McWilliams & Co., for that year.

It is not possible from the record to determine the different periods of the year 1924 in which the items of expense making up the total of $4,923 were incurred and under these conditions we hold that the total expense should be distributed ratably over the period of that year and that three-twelfths of this total is travel expense incurred by petitioner in carrying on an individual business and is subject to deduction in determining his net income for that year.

The deficiencies should be redetermined in accord with the findings of fact and foregoing opinion.

*Judgment will be entered pursuant to Rule 50.*