J. Carl Horneff and Lula Horneff, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 870–66.    Filed April 16, 1968.

*Romolo J. DiCintio*, for the petitioners.
*Peter J. Picotte II*, for the respondent.

#### OPINION

Dawson, *Judge:* Respondent determined a deficiency in the income tax of petitioners for the year 1961 in the amount of $1,960.50.

The only issue for decision is whether the petitioners, who sold their sole proprietorship business in 1961, received payments in excess of 30 percent of the selling price during that year so that they were precluded from using the installment method provided by section 453 [1] in reporting income from the sale. Petitioners have conceded the disallowance of depreciation claimed in the amount of $2,278.65.

All of the facts have been stipulated and are incorporated herein by this reference.

J. Carl Horneff and Lula Horneff (herein called petitioners) are husband and wife who resided in Audubon, N.J., at the time the petition was filed in this proceeding. They filed their joint Federal income tax return for the year 1961 with the district director of internal revenue at Camden, N.J.

Prior to September 1, 1961, the petitioner, J. Carl Horneff, was engaged in the business of manufacture and retail sale of venetian blinds and storm windows as a sole proprietorship, under the trade name Sunbeam Venetian Blind, with his place of business located at 6312 Westfield Avenue, Pennsauken, N.J. Petitioner reported his income from the business in accordance with the accrual method of accounting and on a calendar year basis Petitioners reported all other items of income and deductions on their 1961 joint Federal income tax return in

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

accordance with the cash receipts and disbursements method of accounting.

On August 29, 1961, the petitioners entered into an agreement with William J. Reiss and his wife, Alma M. Reiss (herein called the purchasers), for the sale of the proprietorship business including the land and building. The agreement provides, in pertinent part, as follows:

THIS AGREEMENT, made this 29th day of August, 1961, between Joseph Carl Horneff, Lula Elizabeth Horneff, his wife, Joseph Carl Horneff, t/a Sunbeam Venetian Blind Co., of the Township of Pennsauken, County of Camden and State of New Jersey, of the first part, hereinafter called the "Sellers," and William J. Reiss and Alma M. Reiss, his wife, of the Borough of Haddon Heights, County of Camden and State of New Jersey, of the second part, hereinafter called the "Buyers."

WITNESSETH, that the Sellers and Buyers respectively agree to sell and buy ALL THAT land and premises situate in the Township of Pennsauken, County of Camden and State of New Jersey:

[Description omitted.]

2. Sellers agree to sell and Buyers agree to buy from the Sellers, all of that certain stock of goods, wares, merchandise, materials, supplies, fixtures, machinery, equipment (excluding the jeep, private automobiles of Sellers, two (2) motorcycle tote tractors, private desk and chair and addressograph machine), trade name of Sunbeam Venetian Blind Co., and Holiday Storm Window Products, good will including all accounts receivable and payable belonging to said Sellers, and forming a part of and/or now located at 6312 Westfield Avenue, Pennsauken, New Jersey.

3. Sellers hereby agree to grant and convey to Buyers a Deed for the premises hereinabove described and a Bill of Sale for all the inventory, equipment, fixtures, trade name and good will attached to said business now operated by Sellers under the trade name of Sunbeam Venetian Blind Co. and Holiday Storm Window Products, for and in consideration of the sum of Fifty Thousand ($50,000.00) Dollars, which consideration shall be paid in the manner following:

(a) Buyers shall pay the sum of Fifteen Hundred ($1500.00) Dollars upon the execution of this contract, which shall be held in escrow by Joseph W. Zampino, Esquire, 115 N. 4th Street, Camden 2, New Jersey, said sum to be returned to Buyers in the following events:

(1) In the event title to be delivered shall not be marketable and insurable by a reputable title company and not be free and clear of all encumbrances including municipal liens and assessments and liability for assessments for improvements now constructed, or authorized and not yet assessed.

(2) In the event the Sellers shall not have complied with all the requirements and conditions of the Bulk Sales Law of the State of New Jersey.

(b) The balance of $48,500.00 shall be payable as follows: One Hundred Twenty-Five ($125.00) Dollars per week commencing September 8, 1961, and commencing each and every week thereafter to and including December 29, 1961; and further payment of Eight Thousand Five Hundred ($8500.00) Dollars on January 2, 1962, and the balance of Thirty-Seven Thousand Eight Hundred Seventy-Five ($37,875.00) Dollars payable not less than Fifty Two Hundred ($5200.00) Dollars per year at the rate of One Hundred ($100.00) Dollars per week, but not more than Seventy-Five Hundred ($7500.00) Dollars per year until the entire balance shall have been paid in full, it being understood that none of the said purchase price of $50,000.00 shall bear any interest.

(c) Buyers agree to assume all of the liabilities of Sellers in connection with said business and to continue to make the payments due upon the obligations if and when they fall due.

Sellers agree to co-endorse any note or obligation for Buyers during the term of the mortgage which is to be executed in connection with the sale of the premises hereinafter described.

4. It is understood and agreed by and between the Sellers and Buyers, that should the net worth of said business as of September 1, 1961, be less than $35,000.00, the said purchase price of $50,000.00 shall be reduced by the exact amount by which the said net worth is less than $35,000.00.

A trial balance will be prepared to determine said purchase price, which trial balance shall be subject to audit and certification by the Sellers and inspection and approval of Buyers.

5. Sellers hereby authorize Buyers to take possession and control of said real estate and business effective September 1, 1961, it being understood and agreed that immediately following the execution of this agreement and prior to the closing thereof as herein provided, the Sellers shall make and deliver to the Buyers a full and detailed inventory showing the quantity and so far as possible, with the exercise of reasonable diligence, of each article to be included in the sale as of August 31, 1961, which said inventory the Buyers shall retain. The Sellers shall further furnish to the Buyers a written list of the names and addresses of the creditors of the Seller with the amount of the indebtedness due and owing to each as certified by the Sellers under oath to be a full, accurate and complete list of his creditors and of his indebtedness as of August 31, 1961. At least ten days prior to the closing, Buyers shall notify personally or by registered mail, every creditor whose name and address is stated in said list, of the proposed sale, and of the time, date and place of said closing, and this sale shall not be consummated or completed until all of such steps have been taken. In the even [sic] the Sellers shall fail to furnish such inventory or such list of creditors as herein provided, then this contract shall become null and void and the moneys retained in escrow shall be returned to the Buyers, together with Buyers' reasonable expense, or the Buyers may prosecute any legal or equitable action to which the Buyers may be entitled.

6. Sellers further hereby agree to enter a covenant not to engage in, either directly or indirectly, the same or similar business for a period of five (5) years and within a radius of thirty (30) miles.

7. Settlement is to take place at the office of Joseph W. Zampino, Esquire, 115 N. 4th Street, Camden 2, New Jersey, or any reputable title company within five (5) days after the provisions of the Bulk Sales Act shall have been complied with, at which time Sellers shall deliver a special Warranty Deed for premises hereinbefore described and a bill of sale for all the inventory, equipment, fixtures, trade name and good will and Buyers shall concurrently therewith execute a mortgage to Sellers for the unpaid purchase price.

8. Such part of purchase price, if any, unpaid at time of settlement, is to be delivered to Joseph W. Zampino, Esquire, or said title company, to be disbursed after said title company has completed the necessary continuation search to cover the record date of said Deed.

9. In the even [sic] that such title cannot be made by the Sellers as above, and the Buyers are unwilling to accept such title as the Sellers can make, then at Buyers' option, the above payment or payments shall be returned to the Buyers together with the reasonable expenses of examining the title and making survey, or the Buyers may prosecute any legal or equitable action to which the Buyers may be entitled.

10. In the event of the Buyers not making settlement in accordance with the terms hereof the payment or payments made on account shall, at the Sellers' option, be forfeited as liquidated damages for the failure of the Buyers to settle; or be applied on account of the purchase price.

11. Actual possession is to be given to the Buyers September 1, 1961.

12. The Sellers shall pay, in addition to a proper legal fee, for the drawing of the Deed and all revenue stamps thereof.

13. The Buyers shall pay, in addition to a proper legal fee, for all searches, title insurance, survey and other expenses in connection with settlement.

14. This agreement includes all fixtures permanently attached to the building or buildings herein described, and appurtenances.

The words "Sellers" and "Buyers" in this agreement shall be construed to mean both the plural and singular number and to mean not only the party thereby designated, but also his, her or their respective heirs, executors or administrators.

This agreement may not be assigned nor recorded.

Settlement under the agreement was made on October 17, 1961, as of September 1, 1961. As part of the settlement, a deed was delivered by petitioners to the purchases on October 17, 1961, and was recorded on October 18, 1961. Also as part of the settlement, a bond and warrant was delivered to the purchasers by petitioners on October 17, 1961.

The parties to the agreement did not make an allocation of the selling price to any of the assets sold. As of September 1, 1961, the balance of the accounts representing the assets conveyed and the liabilities assumed by the purchasers pursuant to the agreement were shown on petitioners' books and records as follows:

ASSETS

| | | | |
|---|---|---|---|
| Current assets: | | | |
| Cash in bank | $868. 24 | | |
| Prepaid insurance | 347. 76 | | |
| Prepaid interest | 130. 50 | | |
| Accounts receivable | [1] 26, 075. 38 | | |
| Inventory | 25, 239. 77 | | |
| Total current assets | | | $52, 661. 65 |
| Fixed assets: | | | |
| Depreciable assets | | | |
| Building | 25, 277. 28 | | |
| Machinery and equipment | 9, 844. 55 | | |
| Delivery equipment | 6, 662. 52 | | |
| Office furniture | 6, 567. 40 | | |
| Total | 48, 351. 75 | | |
| Less reserve for depreciation | [2] (22, 072. 82) | | |
| Net depreciable assets | | $26, 278. 93 | |
| Land | | 500. 00 | |
| Total fixed assets | | | 26, 778. 93 |
| Total assets | | | 79, 440. 58 |

### LIABILITIES

Current liabilities:

| | |
|---|---:|
| Accounts payable | $28, 041. 03 |
| Accrued commissions | 993. 05 |
| Accrued salary and taxes | 208. 40 |
| Contract payable (car note) | 1, 243. 01 |
| Note payable (Camden Trust Co.) | 8, 333. 32 |

| | |
|---|---:|
| Total current liabilities | $38, 818. 81 |

Long-term liabilities:

| | |
|---|---:|
| Mortgage payable | 5, 212. 64 |

| | |
|---|---:|
| Total liabilities | $44, 031. 45 |
| Net worth | 35, 409. 13 |
| Total liabilities and net worth | 79, 440. 58 |

¹ This figure represents net accounts receivable. No reserve for bad debts is reflected on the books and records of the seller.

² Adjusted to reflect the disallowance of $2,278.65 depreciation as determined by the Commissioner and not protested by the petitioners.

The total liabilities of the sole proprietorship on September 1, 1961, were $44,031.45. In accordance with section 3(c) of the agreement, the purchasers assumed all of the liabilities and thereafter made payments on them as and when they fell due. The following is a summary of the accounts paid by the purchasers before the end of 1961 on account of these obligations:

| | Paid by purchasers in 1961 |
|---|---:|
| Accounts payable (trade) | $26, 715. 39 |
| Accrued commissions | 993. 05 |
| Accrued salary and taxes | 208. 40 |
| Contract payable (car) | 370. 32 |
| Mortgage payable (real estate) | 425. 09 |
| Notes payable (Camden Trust Co.) | 1, 666. 68 |
| Total | 30, 378. 93 |

Pursuant to sections 3 (a) and (b) of the agreement, the purchasers paid the following amounts to the petitioners before the end of 1961:

| | |
|---|---:|
| Payment upon execution of the agreement | $1, 500 |
| $125 weekly payments from Sept. 18, 1961 to Dec. 29, 1961 | 2, 125 |
| | 3, 625 |

On January 2, 1962, pursuant to the terms of the agreement, the purchasers made a further payment of $8,500 to the petitioners. Subsequent to January 2, 1962, the purchasers made weekly payments of $100 or more and have continued to make such payments.

In their 1961 joint Federal income tax return the petitioners reported the sale of their business on the installment basis, showing a long-term capital gain of $1,065.75. They did not report under section 453, as payments received in the year of sale, any part of the liabilities of the business assumed and paid by the purchasers in 1961.

Respondent contends that the petitioners are not entitled to use the installment method of reporting gain on the sale of their business because in the year of sale petitioners received payments in excess of 30 percent of the selling price. Petitioners contend that they are entitled to use the installment method.

The parties agree that in 1961 the purchasers paid the petitioners $3,625 in cash and made payments of $30,378.93 on assumed liabilities which were due and payable in that year. They also agree that, pursuant to the terms of the agreement, the "selling price" was $94,031.45, i.e., the $50,000 plus assumed liabilities of $44,031.45. See *J. W. McWilliams*, 15 B.T.A. 329, 343 (1929). Hence, the narrow question presented is whether the assumption and payment by the purchasers of petitioners' liabilities due in 1961 constituted "payments" received by petitioners in the year of sale within the meaning of section 453.[2]

---

[2] SEC. 453. INSTALLMENT METHOD.
  (a) DEALERS IN PERSONAL PROPERTY.—
    (1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

      *        *        *        *        *        *        *

  (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—
    (1) GENERAL RULE.—Income from—
      (A) a sale or other disposition of real property, or
      (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
    (2) LIMITATION.—Paragraph (1) shall apply—
      (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
        (i) there are no payments, or
        (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.
      (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939 returnable on the basis and in the manner prescribed in section 44(a) of such Code.

In this connection, the petitioners argue pursuant to section 1.453–4(c), Income Tax Regs.,[3] that those liabilities assumed by the purchasers are not includable as part of the year-of-sale payments to the extent such liabilities do not exceed their basis in the property sold. They further contend that out of the liabilities of $30,378.93 paid by the purchasers in 1961 the $26,715.39 paid on "accounts payable" assumed and $425.09 paid on the "mortgage" assumed should not be included as part of the year-of-sale payments. Respondent, on the other hand, maintains that the entire amount of $30,378.93 paid in 1961 on the assumed liabilities must be included in the year-of-sale payments.

In a carefully considered and reviewed opinion in *Ivan Irwin, Jr.*, 45 T.C. 544 (1966), this Court held, on substantially similar facts, that liabilities of the seller which were assumed and paid by the purchaser in the year of sale were "payments" in that year. We will not repeat here the analysis and reasons contained in our *Irwin* opinion. Suffice it to say that what we said there applies with equal force in the present case.

When the *Irwin* case was decided this Court was aware of the District Court decision in *Marshall* v. *United States*, 241 F. Supp. 30 (S.D. Cal. 1964), and the decision was mentioned in our opinion as being in conflict with *W. H. Batcheller*, 19 B.T.A. 1050 (1930), and the rationale of some other Tax Court cases. At that time, however, we did not know that the Court of Appeals for the Ninth Circuit had, a few days earlier, affirmed the District Court in the *Marshall* case. There the taxpayers sold a proprietorship business for $110,513.22, of which $25,568.86 consisted of short-term business liabilities. In the year of sale the taxpayers received $13,944.36 cash. The purchaser discharged all the assumed liabilities in the year of sale. The taxpayers, as in *Irwin*, argued that section 1.453–4(c), Income Tax Regs., was applicable and that the regulation precluded assumed liabilities from being included in year-of-sale payments, except to the extent they exceeded the seller's basis in the property sold. The Commissioner argued that the liabilities *paid* by the purchaser in that year should be included in year-of-sale payments. The Court of Appeals dealt

---

[3] Sec. 1.453–4 [Income Tax Regs.] Sale of real property involving deferred periodic payments.

(c) *Determination of "selling price."* In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453–1 through 1.453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the payments, the total contract price, or the selling price.

with the question in terms of whether the regulation should be extended to cover the *assumption* of ordinary business liabilities in the sale of the proprietorship. It held that the regulation should be so extended primarily because it could find no valid basis for giving different treatment to ordinary business liabilities than is given to mortgages.

The *Irwin* case was later appealed by the taxpayer to the Court of Appeals for the Fifth Circuit. On February 20, 1968, the Court of Appeals reversed (68–1 U.S.T.C. par. 9231, 21 A.F.T.R. 2d 779 (USCA 5)) our *Irwin* decision. In so doing, it said in part:

This case presents a square conflict between the decision of the Tax Court in this case and a decision of the Court of Appeals for the Ninth Circuit which was decided just nine days prior to the Tax Court decision. *United States v. Marshall*, 9 Cir., 1966, 357 F.2d 294. * * *

The Court of Appeals, affirming the ruling of the District Court in favor of the taxpayer and against the contention of the Commissioner, concluded that the payment of the current obligations by the purchaser should not be included as payment received by the sellers during the year of sale within the meaning of the thirty per cent qualification, § 453(b)(2)(A)(ii), *supra*. The applicable Treasury Regulation, 26 CFR § 1.453–4,[3] relating to the sale of real property and the exclusion of the amount of an assumed mortgage as a "payment" except as it exceeds basis was extended to cover the personal property situation.

\*    \*    \*    \*    \*    \*    \*

We agree with the *Marshall* Court that these current liabilities, although assumed and paid, are not, under the statute, payments within the year of sale. They are excluded by reason of the mortgage assumption exception of the Regulation, *supra*. See 2 Mertens, Law of Federal Income Taxation, (rev. ed. 1967), § 15.16. Appellants were entitled to the benefit of the installment method under § 453, *supra*.

[Footnote omitted.]

We have reconsidered our *Irwin* opinion in the light of the views expressed by the Courts of Appeals for the Fifth and Ninth Circuits. We have decided, after careful reexamination, to adhere to our *Irwin* opinion, and, in doing so, we respectfully decline to follow the Courts of Appeals for the reasons set forth below.[4]

Both Courts of Appeals rest their decisions primarily on what we regard as an erroneous foundation, i.e., the current liabilities, although assumed and paid, are not "payments" in the year of sale since they

---

[4] The split between our point of view and that of the Ninth Circuit has been the subject of the following articles: Kirk, "Installment Sale Reporting of Income—Are Current Liabilities Similar to Mortgages?" 1 Cal. West. L. Rev. 154–160; Berger, "Installment Sales with Assumed Liabilities," 122 J. Accountancy 41–47 (Aug. 1966); DeCastro & Chodorow, "Can Buyer's Payment of Assumed Debt Kill Seller's Installment Election? Courts Disagree," 25 J. Taxation 130 (Sept. 1966); Koblenz, "Installment Sales—Purchaser's Assumption of Liability to Third Party," 18 Western Res. L. Rev. 906 (March 1967); Horan, "Assumption and Discharge of Seller's Liabilities as Year of Sale Payments for Purposes of I.R.C. Section 453," 16 Buffalo L. Rev. 758 (Spring 1967); and Emory, "The Installment Method of Reporting Income: Its Election, Use and Effect," 53 Cornell L. Rev. 181, 231–243 (Jan. 1958).

are excluded "by reason of the mortgage assumption exception" contained in section 1.453–4(c) of the regulation. Among other things, this regulation provides that, to the extent they exceed the seller's basis in the property sold, assumed mortgage liabilities are to be included in the "payments," receipt of which triggers recognition of a portion of the total gain under the installment method. The regulation does not require as a prerequisite of its applicability that the assumed liabilities also be paid. Although the regulation does not specify in what period such amounts are to be treated as payments, they are deemed to be payments immediately as of the time the liabilities are assumed, in most cases the year of sale.

This regulation can be a serious obstacle to qualification under the 30-percent test when a mortgaged asset with low basis is conveyed to a purchaser who assumes or takes subject to the mortgage. In *Burnet v. S. & L. Bldg. Corp.*, 288 U.S. 406 (1933), the Supreme Court sustained the validity of the regulation as within the authority specifically granted to the Secretary of the Treasury by the terms of section 453 to effectively implement its intent. However, the scope of the regulation is somewhat uncertain: Is it limited in applicability to assumption of mortgages? We think it is because the regulation is expressly applicable to mortgage liabilities only and does not extend to nonmortgage liabilities assumed by a purchaser. Cf. I.T. 2468, VIII–1 C.B. 159.

Examination of the regulation's history and purpose reveals that it is not designed primarily to govern year-of-sale payment questions but was introduced for an entirely distinct technical purpose, and its effect on year-of-sale payments is merely an incidental byproduct. Such an examination also shows convincingly that there is a good reason why the regulation may logically be limited to transfers of *mortgage* liability.

Prior to amendment in 1929, the predecessor of section 1.453–4(c), Income Tax Regs., article 44, Regs. 69, provided, in pertinent part, as follows:

In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall not be considered as a part of the "initial payments" or of the "total contract price" but shall be included as part of the "purchase price," * * *

The rationale behind this early regulation, and the reason why the term "contract price" is to this day given an artificial meaning in applying the installment sale provisions in mortgage situations, was explained by the Supreme Court in *Burnet v. S. & L. Bldg. Corp.*, *supra*. The installment method of reporting requires a *portion* of every payment made by the buyer to be taxed as gain to the seller. If the

buyer assumes a mortgage or other liability of the seller, in all cases in which the regulation does not apply, recognition of gain is spread over not only the payments made by the buyer to the seller but also over payments made by the buyer to creditors of the seller. Thus, each time the buyer makes a payment to a creditor of the seller, the seller must report some income. This application of the installment method results from including liabilities assumed in the "contract price," the denominator in the fraction which produces the gross-profit percent by definition of section 453 (a). If these assumed liabilities are included in the denominator, it is easy to see that in order to tax the entire net gain it is necessary to apply the gross-profit percent to the payment of the assumed liabilities, even though these payments are not made to the seller but to some third party.

In order to eliminate the administrative inconvenience of imposing and collecting a tax from the seller every time the buyer made a payment to the third party mortgagee, the original version of article 44, Regs. 69, was promulgated by the Commissioner. By defining "contract price," the term used in the statute to describe the denominator in the gross-profit percent fraction, as not including the amount of an assumed mortgage, the regulation has the effect of raising the gross-profit percent, thereby permitting a recognition of all of the gain solely upon payments made directly to the seller. As the Supreme Court said in *Burnet* v. *S. & L. Bldg. Corp.*, *supra*, in the case of an assumption of a mortgage, if the installment method were not applied in the manner prescribed in the regulation, it "would inevitably lead to many practical difficulties, might postpone collection far beyond the time when the vendor would receive any direct payments, and probably would render impossible determination from the taxpayer's books of what he should account for."

While it appears that the principal reason behind the original regulation was to eliminate the administrative inconvenience described above, the regulation also touched upon "initial payments," stating that mortgages assumed were not to be included therein. However, this reference to "initial payments" was superfluous to the principal purpose for adopting the regulation, and its inclusion should be regarded as merely for the sake of completeness; i.e., as long as there was a pronouncement concerning the includability or nonincludability of mortgages assumed for purposes of one technical definition, the same regulation might as well clear up possible questions as to other terms subject to technical definition. The position taken that mortgages assumed were *not* part of initial payments accorded with the policy behind the 30-percent test.

The regulation was amended in 1929 in such a way as to provide that mortgages assumed, to the extent they exceed the seller's basis in

the property sold, were to be included in both "contract price" and "initial payments." This amended regulation, which is in essence the same as the current regulation, represented a compromise between two conflicting policy considerations. In cases in which the property was sold subject to a mortgage which exceeded its basis, the gross-profit percent calculated according to the regulation prior to amendment would be greater than 100 percent. In such a situation the total gain on the transaction would be greater than the total cash (or other tangible payments) ultimately to be received directly by the seller. If the total gain is to be recognized and taxed only as payments are received by the seller himself, the gross-profit percent must be more than 100 percent since the total receipts by the seller will be less than 100 percent of the total gain.

Rather than impose a tax on a gain of greater than 100 percent of payments received, the Commissioner, in amending the regulation as he did, caused the "contract price" to be raised to an amount which equaled the gross profit on the sale, thus producing a gross-profit percent of 100. The amount necessary to so augment the "contract price" is equivalent to the excess of the mortgage assumed over basis of the asset sold, such excess representing the portion of total gain which will not be received in cash or other assets by the seller.

If some portion of the mortgage assumed is to be included in the "contract price," then, unless the regulation provides otherwise, there would still exist the administrative problem of taxing gain to the seller as payments are made by the buyer to the third-party mortgagee. However, the regulation as amended eliminates this problem by including the mortgage assumed, to the extent it is included in the "contract price," in the "initial payments" as well, thus triggering, in the year of sale, recognition of the entire amount of gain in excess of cash to be ultimately received. By thus recognizing gain in the year of sale to the extent necessary, the administrative problem of recognition of gain upon payments by the buyer to the mortgagee is eliminated, and the gross-profit percent applicable to cash eventually received by the seller is reduced to no more than 100 percent.

In our opinion the effect of this regulation upon the 30-percent test, insofar as it considers assumed mortgages to be year-of-sale payments, is merely an incidental effect or unavoidable byproduct of its principal function. Hence we see the underlying purpose of the regulation as pointing to the conclusion that it should be read narrowly and applied sparingly, especially when its application will have the unintended side effect of increasing year-of-sale payments and thereby disqualifying a transaction under the 30-percent test.

It appears to us that the Court of Appeals in *Marshall* extended the regulation beyond the mortgage situation, not to disqualify the transaction under the 30-percent test by increasing the year-of-sale pay-

ments but to prevent what the court thought would have been disqualification if the regulation did not apply. We believe the Court of Appeals labored under the misapprehension that, unless the regulation were applicable, all of the proprietorship liabilities *assumed* would have to be considered as initial-year payments, regardless of whether or not they were paid by the purchaser in the year of sale. No doubt this conclusion was based, at least in part, upon faulty dictum which appeared in our opinion in *Stephen A. Cisler, Jr.*, 39 T.C. 458, 466 (1962). However, our *Irwin* opinion now makes it clear that assumed liabilities are ordinarily not considered as initial-year payments except to the extent the buyer pays them off.

We also think the Courts of Appeals ignored the plain meaning of the word "payments" as used in section 453(b)(2)(A)(ii). Clearly liabilities which are *assumed and paid* in the seller's year of sale should be included in initial-year "payments" for the purpose of the 30-percent test. A brief review of the precedents lends support to this view. Some symmetry of the precedents is possible if the starting point in each instance is, as expressed in our *Irwin* opinion, whether the seller's net worth available to pay the tax generated by the sale has been increased in the year of sale by more than 30 percent of the selling price. Direct payments of cash or other property to the seller in the year of sale, such as a cash downpayment, present the simplest situation. Such payments would increase the seller's funds available to pay the tax. Where a buyer merely assumes an obligation of a seller, the situation is not quite as clear. Since the seller would still be contingently liable on the debt, his other assets would not be "freed" to be used to pay his tax. Thus the buyer's assumption of an obligation of the seller would not, standing alone, constitute a "payment" in the year of sale. However, if the assumed obligation is extinguished in the year of sale by novation,[5] by payment,[6] or by cancellation,[7] it will constitute a payment in the year of sale because the seller would no longer be liable on the obligation and his other funds would be available for the payment of the tax rather than for the payment of the liability.

The Courts of Appeals have looked at the relationship from the point of view of the *assumption*, rather than the *payment*, of the liabilities. They reason, and we think incorrectly, that since the assumption of a mortgage is not considered a part of payments in the year of sale, the assumption of a seller's personal liabilities should likewise not be considered as such. We would agree that in the nonmortgage situation the mere assumption of the seller's liabilities should not be considered a payment, and we view the *payment* of the liabilities as the key factor. Consequently, we do not accept the approach taken by the Courts of

[5] *Stephen A. Cisler, Jr.*, 39 T.C. 458 (1962).
[6] *Wagegro Corporation*, 38 B.T.A. 1225 (1938).
[7] *James Hammond*, 1 T.C. 198 (1942).

Appeals because most of the liabilities had been paid in the year of sale. Payment, as we pointed out in *Irwin*, extinguishes, cancels, or discharges the seller's liability and this is the same as receiving additional cash in the year of sale. This seems logical since it provides equality of treatment between the seller who has few liabilities and the seller who has many debts.[8]

Accordingly, we hold that the petitioners received year-of-sale payments totaling $34,003.93, composed of cash ($3,625) and liabilities ($30,378.93) due in that year which were assumed and paid by the purchasers. The amount of $34,003.93 is in excess of 30 percent of the selling price of $94,031.45. It therefore follows that the petitioners are not entitled to report their gain on the installment basis under section 453.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

TANNENWALD, *J.*, dissenting: I think that the result reached by the majority herein clearly frustrates the intent of Congress in enacting section 453 of the Internal Revenue Code of 1954 and its predecessor, section 44(b) of the Internal Revenue Code of 1939.

The enactment of statutory provisions permitting the installment method of reporting income was generated by the fact that the usual cash or accrual bases of reporting created hardship in such situations. See *Burnet* v. *S. & L. Bldg. Corp.*, 288 U.S. 406, 413 (1933). The underlying concept was that the tax should be paid "from the *proceeds collected* rather than be advanced *by the taxpayer.*" See *Thomas F. Prendergast, Executor*, 22 B.T.A. 1259, 1262 (1931). (Emphasis supplied.) As the Supreme Court stated in *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 503 (1948):

The installment basis of reporting was enacted, as shown by its history, to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had *received in cash* only a small portion of the sales price. [Emphasis supplied.]

---

[8] For example, assume that taxpayer A has $1,500 in his bank account and uses it to invest in a new product. When the product appreciates to $2,000, he sells his investment for $2,000, taking back a 5-year note for $500 and cash of $1,500 which he redeposits in his bank account. He does not qualify for installment sale treatment because the $1,500 cash is more than 30 percent of the selling price. Taxpayer B also has $1,500 in his bank account but he decides that he would rather invest with other people's money. He therefore buys the product on credit, leaving his bank account undiminished. When he later sells the product, the buyer assumes and pays the $1,500 liability to the product supplier and gives B a 5-year note for $500. If the payment of the liability were not considered cash in the year of sale, B would be able to use the installment method despite the fact that he is in exactly the same position as A (both have $1,500 in the bank account and a $500 note). By treating the payment of the liability as cash in the year of sale, equality of treatment is achieved. And, in effect, when the buyer pays B's liability, B's $1,500 bank account is freed to pay any taxes that may have resulted from the sale.

Granted that an assumption of the seller's liabilities should properly be taken into account in determining the extent to which a seller has realized gain, or indeed when such gain should be reported under the normal rules of cash or accrual accounting for tax purposes, it does not follow that the same framework should be employed to determine how the installment method of reporting should be applied. See *Ivan Irwin, Jr.*, 45 T.C. 544, 549. Indeed, in both the *Irwin* opinion in this Court and the majority opinion herein, a different standard keyed to the fact of payment is adopted. And respondent's regulations and rulings similarly apply a different standard in order to tax in the year of sale the amount by which the face amount of an assumed obligation exceeds the cost basis of liened property, irrespective of when or whether payment of the obligation is made—a position which has been sustained as an administratively convenient means of assuring that such portion of the seller's profit will not escape tax. See *Burnet* v. *S. & L. Bldg. Corp.*, *supra*. Thus, an asymmetrical rationale is in full flower with respect to the treatment of assumed obligations generally under the installment-reporting provisions.

Similar administrative reasons, which led to respondent's regulations dealing with mortgaged property, are present where there is an assumption of unsecured indebtedness. Even though secured obligations may often be of longer duration than unsecured obligations, this is not always so. The logic of the position adopted by the majority herein and in *Irwin* would seem to me to require that the assumed liabilities be included in the "contract price" and that the seller report and pay tax on a prorata portion of each payment of such liabilities as made by the purchaser.[1] Thus, the same administrative difficulties encountered in connection with secured obligations—perhaps different in degree of frequency and timing—will be encountered. Such a result would be avoided if the applicable rules were the same whether the obligations involved were secured or unsecured.

The premise of the majority's position is that the payment by the purchaser of an assumed debt of the seller is the same as a payment of cash to the purchaser because it increases his net worth. See *Ivan Irwin, Jr.*, *supra* at 551. The premise is at best questionable, since it would appear that, for all practical purposes, it is the assumption itself rather than the payment that increases the net worth and even then this occurs in connection with a sale of assets only if the assets used in the net worth computation are determined on the basis of cost rather than a higher fair market value. See Horan, "Assumption and Dis-

---

[1] It would also seem to follow from such position that, even in the mortgage situation, a portion of each payment of the obligation would be taxed even though there was no excess of the obligation over the basis of the mortgaged property or, if there was an excess, it would be taxed when payment is made even though such excess had already been taxed in the year of sale.

charge of Seller's Liabilities as Year of Sale Payments for Purposes of I.R.C. Section 453," 16 Buffalo L. Rev. 758 (1967). And, in any event, net worth increases are not determinative of whether a payment has been received for the purpose of computing the 30-percent test under section 453, especially when one recalls that the underlying purpose of the legislation was to key the time for reporting income to actual collections of the proceeds of sale.

While there is a theoretical comparability between the facts involved in cases such as *Riss* v. *Commissioner*, 368 F. 2d 965 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court, *James Hammond*, 1 T.C. 198 (1942), and *Wagegro Corporation*, 38 B.T.A. 1225 (1938), and the factual situation involved herein, there is an important practical difference in that in those cases the payment—either to the third party or to the seller by way of cancellation—occurs simultaneously with or as an integral part of the closing of the sale itself and is not at an indeterminate time after the closing. The compelling administrative reasons relative to the difficulty of policing the transaction do not exist.

What bothers me most about our position in situations such as is involved herein is that it puts a premium on the form of handling the sale transaction in the right fashion, e.g., by holding back the accounts payable and an equivalent amount of accounts receivable, by extracting a covenant against payment in the year of sale from the seller, or by attempting to separate the sale into several parts. See Koblenz, "Installment Sales—Purchaser's Assumption of Liability to Third Party," 18 Western Res. L. Rev. 906 (1967); Berger, "Installment Sales with Assumed Liabilities," 122 J. Accountancy 41 (1966). Not only are many of these forms commercially unrealistic, but the probable sanctuary of their use turns section 453 into a tax trap for the unwary. I recognize that in other areas we have been left with little choice but to put taxpayers in the straitjacket of the formalities with which they have handled a particular transaction. Compare *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950), with *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945). But we have not been inclined to penalize taxpayers in the past for their unwariness where section 453 is involved (cf. *Jack Farber*, 36 T.C. 1142 (1961), affd. 312 F. 2d 729 (1963)), and I see no compelling reason for us to do so under the circumstances of this case.

It cannot be gainsaid that neither the assumption of petitioner's liabilities nor their postclosing payment by the purchaser put any cash in petitioner's hands with which to pay the tax. Such being the case and given the avowed congressional purpose in enacting the installment reporting provisions, I agree with the Circuit Courts of Appeals decisions in *Marshall* and *Irwin* and would apply the approach

of section 1.453–4. Income Tax Regs., to the instant situation, disregarding the fact of actual payment.

One final word. Our opinion in *Irwin* and the majority opinion herein reflect the point of view that a novation would constitute a payment to be included in the 30-percent computation. I am not convinced that this result would necessarily obtain and the emphasis in the opinion in *Irwin* on *extinguishment* or *cancellation of the debt* as well as *payment* indicates that it might not. See 45 T.C. at 551. In many purchases of a business, the purchaser takes over a line of bank credit in favor of the seller, or establishes its own line of credit, and the seller is relieved of liability. But, as a factual matter, the indebtedness *of the business* is not only not extinguished or canceled but continues indefinitely. I recognize that the language in our opinion in *Stephen A. Cisler, Jr.*, 39 T.C. 458, 466 (1962), treats a novation as payment but it is dictum. The novation issue is not involved herein and I think it would be unfortunate if our opinion in *Irwin* or the majority opinion herein should be read as disposing of the issue.

FAY, SIMPSON, and FEATHERSTON, *JJ.*, agree with this dissenting opinion.