Powell White and Lucille White v. Commissioner.White v. CommissionerDocket No. 6524-67.United States Tax CourtT.C. Memo 1970-132; 1970 Tax Ct. Memo LEXIS 229; 29 T.C.M. (CCH) 588; T.C.M. (RIA) 70132; May 28, 1970, Filed Robert Earl Smith, 1418 IBM Bldg., Seattle, Wash., for the petitioners. Millard D. Lesch, for the respondent. FORRESTERMemorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1964 in the amount of $4,803.76. Concessions having been made, the only remaining issue herein is whether (1) petitioners, in 1964, sold their stock in Pacific Bowling & Billiard Co. and realized a capital loss; or (2) in the alternative, whether petitioners are entitled*230 to a deduction because the stock of Pacific Bowling & Billiard Co. became worthless in 1964. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference. At the time of the filing of the petition herein Powell White (Powell) and Lucille White (Lucille) were husband and wife. Powell resides in Phoenix, Arizona, and Lucille resides in Seattle, Washington. For the calendar year 1964 they filed a joint individual income tax return as cash basis taxpayers with the district director of internal revenue, Tacoma, Washington. Pacific Bowling & Billiard Co. (Pacific) is the successor corporation of a business started by Powell in 1946. Prior to November 17, 1964, Powell and Lucille owned 1,949 shares of Pacific, which comprised approximately 80 percent of the stock of that company. Pacific is a bowling and billiard supply house which sells billiard and bowling supplies and installs, resurfaces and maintains bowling lanes and billiard tables. At the time of the proceeding herein, Fredric A. Danz (Fredric) was president and general manager of Sterling Theatres Company (Sterling). Sterling's*231 primary operations were in the amusement, entertainment, and recreational business. In 1964 Sterling owned stock in Pacific which was acquired in the early part of 1961 from the predecessor of Pacific. On November 17, 1964, Powell and Lucille entered into the following agreement with Fredric: AGREEMENT (Re: Sale of stock in Pacific Bowling & Billiard Co.) THIS AGREEMENT, made and entered into this 17th day of November, 1964, by and between POWELL L. WHITE and LUCILLE M. WHITE (herein called "Seller") and FREDRIC A. DANZ and his nominee (herein called "Purchaser"); WITNESSETH: WHEREAS, Seller is the owner of One Thousand, Nine Hundred and Forty-Nine (1,949) shares of the issued and outstanding common capital stock of PACIFIC BOWLING & BILLIARD CO. (constituting approximately eighty-two percent (82%) of the outstanding stock; and Seller is desirous of selling and disposing of this stock and ceasing his activities as an employee of Pacific Bowling & Billiard Co. (herein called "Corporation") and engaging in the bowling supply business in Seattle; and WHEREAS, Purchaser is desirous of purchasing this stock of Seller under the terms and conditions set forth herein; 589*232 NOW, THEREFORE, In consideration of the mutual covenants and agreements contained herein, IT IS AGREED AS FOLLOWS: 1. Subject Matter of Sale Seller agrees to sell, and Purchaser agrees to buy 1,949 shares of the issued outstanding capital stock of Pacific Bowling & Billiard Co., evidenced by Certificate No. 101 standing in the name of Powell L. White. Seller warrants and represents that he is the owner and holder of the aforesaid 1,949 shares of common stock of Corporation and there are no liens, charges or encumbrances whatsoever against said stock, and that he has full right and authority to sell the same, except, the said stock is subject to a pledge in favor of the North West Bank as security for Seller's obligations to North West Bank in connection with guaranteeing the repayment of all monies loaned from North West Bank to Corporation. 2. Purchase Price for Stock The price to be paid Seller by Purchaser for the stock at the time and in the manner provided for herein shall be One Thousand, Nine Hundred and Forty-Nine and no/100 Dollars ($1,949.00), (i.e., $1.00 per share). 3. Title to Stock and Deposit in Escrow Title to the stock being sold hereunder shall remain*233 in Seller until the purchase is paid in full, and the conditions pertaining to the sale as set forth in Paragraph 4 below are met in full. During this time the said stock shall be placed in escrow with the North West Bank to be delivered to Purchaser on fulfillment of said conditions and payment of said purchase price, or to be redelivered to Seller in the event the conditions are not met or the purchase price is not paid, as set forth in Paragraph 5 below. 4. Additional Conditions of Sale As part of this sale, and as additional consideration to Seller for his agreeing to sell his stock to Purchaser, Purchaser agrees that he will exercise his best efforts to cause Corporation to do the following things: (a) Acknowledge that it is presently indebted to Seller in the amount of $52,712.21, at the present time, evidenced by the following described promissory notes: DateAmount4/15/64$25,553.316/30/6427,158.90(b) In full payment of the first of the aforesaid notes (the one dated 4/15/64) to transfer, set over and assign unto Seller the following described personal property: (i) All of the inventory and merchandise, fixtures and equipment owned by Corporation*234 which are located in its place of business in Portland, Oregon (the inventory and merchandise having a book value of approximately $23,000.00, and the fixtures and equipment having a value of approximately $2,000.00); (ii) The 1961 Ford Econoline truck which is carried on the books of Corporation, but whose certificate of title is issued in the name of Powell L. White (having a value of approximately $500.00); (iii) The small posting machine which Corporation acquired from Bowling Distributors, Inc.; (iv) An assignment and transfer of the non-competition agreement executed by Walter Bardy, a sole proprietor d/b/a Olympic Bowling Supply, of Portland, Oregon, in favor of Pacific Bowling & Billiard Co., under the terms of which Bardy agreed not to compete with Pacific in the bowling supply business in the Portland and Eugene areas in Oregon for five (5) years. (c) After payment to Seller under paragraph (b) above, the balance due Seller from Corporation will be $27,158.90 under the remaining promissory note. This note shall remain payable on a demand basis, but shall bear no interest for a period of two (2) years from the date of this agreement. Any balance remaining due after*235 said two (2) years shall bear interest at the rate of six (6) per cent per annum. (d) As promptly as possible to either pay off all loans from North West Bank to Corporation which are guaranteed by Powell L. White and/or Lucille M. White, his wife, or to reduce said loans to a point that North West Bank will release Powell L. White and Lucille M. White from their personal guaranties of said loans. Purchaser shall not incur any personal responsibility for failure of Corporation to fulfill and perform the items set forth above, but shall exercise its best efforts to cause it to do this. At such time as the above conditions have been fulfilled, and the purchase price for the stock has been paid to Seller, the stock shall be released from the escrow deposit with North West Bank and delivered to Purchaser. 5. Return of Stock In the event that the conditions set forth in Paragraph 4 above are not fulfilled and the purchase price for the stock is not paid Seller within what he, in his sole 590 discretion, determines to be a reasonable time, he may demand that Corporation pay him all sums due under the promissory notes referred to above, take steps to have the personal guaranties*236 released by North West Bank, and that Purchaser pay him the purchase price for the stock. If these conditions are not met within thirty (30) days following the giving of such written demand to Purchaser, the stock in escrow shall be returned to Seller free of and from any claim of purchaser, this agreement shall cease and terminate with all rights of the parties hereto immediately terminated. 6. Irrevocable Proxy Contemporaneously with the execution of this agreement, Seller shall execute an irrevocable proxy in favor of Purchaser, coupled with an interest, covering all of the stock subject to this agreement, and giving Purchaser the irrevocable right to vote such stock so long as this agreement remains in full force and effect. In the event the stock is returned to Seller under the provisions of Paragraph 5 above, then the irrevocable proxy shall cease and terminate. 7. Officers and Directors Contemporaneously with the execution of this agreement, Powell L. White and Lucille M. White shall resign as officers and directors of the corporation. Purchaser, through his rights as holder of the irrevocable proxy pertaining to the stock covered by this agreement, shall have the*237 right to vote for or appoint new officers and directors of Corporation. The employment of Powell L. White and Lucille M. White, and their right to compensation as employees of Corporation, shall cease and terminate as of December 1, 1964. 8. Non-Competition In consideration of the purchase of Seller's stock hereunder, and the covenants and agreements of Purchaser, Seller covenants and agrees that he will not compete with Pacific Bowling & Billiard Co. in the State of Washington, and will not engage, directly or indirectly, in the bowling supply business in the State of Washington for a period of three (3) years from the date of this agreement; provided, that if Seller's stock is returned to him under the provisions of Paragraph 5 above, then this covenant not to compete shall be null and void. In consideration of Seller's accepting the assets described in Paragraph 4 hereof in satisfaction of the promissory note for $25,553.31, Purchaser covenants and agrees that he will not permit Pacific Bowling & Billiard Co. to compete with Seller in the bowling supply business in the State of Oregon for a period of three (3) years from the date of this agreement. 9. Business Premises*238 Pacific Bowling & Billiard Co. has been occupying the building and premises at 2120 Second Avenue, Seattle, Washington 98121, on a month-to-month tenancy arrangement with the owners thereof, Powell L. White and Lucille M. White. It is understood and agreed that for the time being Pacific Bowling & Billiard Co. will continue to occupy said premises on the same basis, namely, on a month-to-month tenancy, under the terms of which the rental payable to Powell L. White and Lucille M. White shall be $650.00 per month, payable on the 1st day of each month; with taxes and insurance to be paid by the owners, and light, heat, other utilities, and general maintenance and upkeep to be paid by the tenant. 10. Notices Notices required or provided for herein shall be in writing, and shall be effective either when delivered personally, or upon the next succeeding business day following deposit of such notice in the United States Mail, postage prepaid and properly addressed. Notice to Seller shall be addressed to him as: Powell L. White and Lucille M. White 19345- 37th N.E. Seattle, Washington 98155 or such other address as he may here-after designate in writing. Notice to Purchaser shall*239 be addressed to Purchaser as: Mr. Fredric A. Danz, President Sterling Theatres Co. Palomar Building Seattle, Washington 98101 or such other address as he may here-after designate in writing. IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first hereinabove set forth. /s/Powell L. White Powell L White /s/Lucille M. White Lucille M. White SELLER /s/Frederic A. Danz Frederic A. Danz PURCHASER The undersigned, being the owner and holder of Thirty-Two (32) shares of the 591 issued and outstanding capital stock of Pacific Bowling & Billiard Co., does hereby covenant and agree that he will add his stock to that of the Seller in the above Agreement for sale to Purchaser, in the event Purchaser is able to make satisfactory arrangements to him for the purchase and acquisition of 100% of the outstanding stock of Pacific Bowling & Billiard Co./s/Powell L. White, Jr. Powell L. White, Jr. JHM:mlj 11/17/64 In conjunction with the agreement of November 17, 1964, and specifically paragraph 3 therein, petitioners, and Frederic, individually and for Pacific, entered into an escrow agreement with North West Bank (hereinafter*240 sometimes referred to as North West) on November 23, 1964, which stated: Received from Northwest Bank 9-14-66 by R.E.K. November 23, 1964 North West Bank Third and Pine Seattle, Washington 98101 Gentlemen: You are handed herewith an "Assignment Separate from Certificate" covering 1949 shares of the common capital stock of Pacific Bowling & Billiard Co., and Certificate No. 101 for 1949 shares standing in the name of Powell L. White. The stock shall be held by you under the terms of this agreement. The deposit of the aforesaid "Assignment Separate from Certificate" and the stock with you, is in connection with the agreement pertaining to the sale of the stock from Powell L. White to Fredric A. Danz, a copy of which is attached hereto. It is requested that you serve as escrow agent for the parties to this agreement in connection with the sale of the stock. When the following conditions have been met, to-wit: (1) You have released Powell L. White and Lucille M. White from their personal guaranties of any obligations of Pacific Bowling & Billiard Co. to you, but, however, you are under no obligation to so release until indebtedness to the bank is paid in full; and*241 (2) Fredric A. Danz furnishes you with evidence that the monies due Powell L. White from Pacific Bowling & Billiard Co. under his promissory note dated June 30, 1964, having a principal balance due of $27,158.90, with the monies due to include this principal balance and to include interest at 6% per annum after November 17, 1966; and (3) Fredric A. Danz furnishes you with evidence that the purchase price for the stock in the amount of $1,949.00 has been paid to Powell L. White; you are authorized and directed to release and deliver the aforesaid "Assignment Separate from Certificate" and the stock certificate No. 101, for 1,949 shares of stock, to Fredric A. Danz. If prior to the fulfillment of the foregoing conditions, you are furnished with the following evidence: (1) Copy of letter from Powell L. White and Lucille M. White to Pacific Bowling & Billiard Co. and Fredric A. Danz, making demand for payment of the balance due under the promissory note dated June 30, 1964, as referred to above; and making demand upon Fredric A. Danz for payment of the purchase price of the stock, namely, $1,949.00; and (2) Postal return receipt evidencing that the said letter was mailed to*242 Pacific Bowling & Billiard Co. and Fredric A. Danz; and (3) Expiration of 30 days following the date of the postal return receipt, and during this time, Pacific Bowling & Billiard Co. and Fredric A. Danz failed to make arrangements with and through your bank for payment of the aforesaid sums and for the release of Powell L. White and Lucille M. White from the personal guaranty of obligations of Pacific Bowling & Billiard Co. to you; then you are authorized and directed to deliver and return the aforesaid "Assignment Separate from Certificate" and the stock certificate No. 101 for 1,949 shares of stock in Pacific Bowling & Billiard Co., to Powell L. White. Pacific Bowling & Billiard Co. agrees to pay your charges for services as escrow agent hereunder. Very truly yours, /s/Powell L. White Powell L. White /s/Lucille M. White Lucille M. White PACIFIC BOWLING & BILLIARD CO.By /s/Fredric A. Danz its /s/Fredric A. Danz Fredric A. Danz The undersigned acknowledges receipt of the foregoing instructions and the 592 "Assignment Separate from Certificate" referred to therein; and further acknowledges that it presently holds Stock Certificate No. 101 for 1949 shares*243 of stock in Pacific Bowling & Billiard Co., standing in the name of Powell L. White. North West Bank undertakes no obligations except to carry out the specific instructions as set forth above. The Bank assumes no obligation in connection with the agreement re sale of stock in Pacific Bowling & Billiard Co. The undersigned further agrees to act as escrow agent herein, pursuant to the terms and conditions set forth above. DATED this 23rd day of November, 1964. NORTH WEST BANK /s/Francis T. Scott its Asst. Vice Pres. In accordance with paragraph 6 of the November 17, 1964, agreement Powell, on November 23, 1964, executed a proxy in favor of Fredric. Said proxy is reproduced below: IRREVOCABLE PROXY (Re: Pacific Bowling and Billiard Co.) KNOW ALL MEN BY THESE PRESENTS; That the undersigned stockholder of PACIFC BOWLING & BILLIARD CO., a Washington corporation, does hereby nominate and appoint FREDRIC A. DANZ, as his true and lawful attorney, with power of substitution for him and in his name, place and stead, to vote upon all of the stock of the undersigned in Pacific Bowling & Billiard Co. (the said stock consisting of 1,949 shares evidenced by Certificate No. 101 standing*244 in the name of the undersigned), at any and all meetings of the stockholders of Pacific Bowling & Billiard Co., whether these be annual meetings or special meetings, and for any and all purposes, so long as this Irrevocable Proxy remains in full force and effect; the said proxy to have all of the powers the undersigned would possess if present personally at any such meetings. This Irrevocable Proxy is given in connection with an Agreement pertaining to the sale of the stock covered hereby from the undersigned to the proxy holder, Fredric A. Danz, and shall be irrevocable so long as the said Agreement, dated November 17, 1964, remains in full force and effect. In the event the said purchase agreement ceases and terminates, and the rights of Fredric A. Danz as purchaser thereunder terminate through his having failed to complete the terms for the purchase of the stock of the undersigned, then this Irrevocable Proxy shall terminate; but until such time, it shall remain in full force and effect. DATED this 23 day of November, 1964. /s/Powell L. White Powell L. White Also on November 23, 1964, and in conjunction with the conditions of sale set forth specifically in paragraph 4(b) *245 of the November 17, 1964, agreement, Fredric, as president of Pacific, gave Powell a bill of sale for the personal property described in paragraph 4(b)(i), (ii), (iii) and (iv) of the November 17 agreement. After November 17, 1964, Powell resigned as an officer and director of Pacific; Fredric and his staff took over the management and operation of Pacific; and Lucille continued as an employee. Pacific was operated by Fredric for about one month and until the middle of December 1964, at which time Fredric abandoned the business. Lucille continued to work for Pacific after Fredric abandoned the company. Powell resumed employment with Pacific in either January or March of 1965. The following letter dated August 31, 1965, signed by Fredric and countersigned by Powell and Lucille on September 11, 1965, was sent to Francis Scott of the North West Bank: STERLING THEATRES CO. Affiliate: STERLING BOWLING CO. 975 John Street - MAin 4-2500 Seattle, Washington 98109 August 31, 1965 Dear Mr. Scott: Mrs. Lucille White has requested that we authorize you to release their stock in Pacific Bowling & Billiard Co. which you hold in escrow. This letter is to notify you that*246 Mr. and Mrs. White and I have concluded the arrangement satisfactorily, wherein the stock was held in escrow for me and for others. Due to circumstances beyond the control of Mr. and Mrs. White I was prevented from concluding the deal and by mutual agreement and without recourse for either party, our agreement has been terminated. If there are any questions, do not hesitate to call. 593 Thank you for the courtesy you have shown me. Yours Truly, /s/ Fredric A. Danz Fredric A. Danz FAD:dlc The undersigned agree to the statements contained in this letter. /s/ Lucille White Lucille White (date) 9/11/65 /s/ Powell White Powell White (date) 9/11/65 Mr. Francis Scott Northwest Bank Third and Pine Seattle, WashingtonOn September 20, 1965, Lucille received the 1,949 shares of Pacific from North West. According to unaudited statements, Pacific, for the year ended June 30, 1964, had a net loss, so that its Shareholders' Equity on June 30, 1964, was $60,250.71. An unaudited interim statement for the six months ending December 31, 1964, also reflected a loss so that Pacific's Shareholders' Equity on December 31, 1964, showed a deficit of $34,384.67. In 1964*247 the bowling industry in general was in a decline and part of this loss was due to defaults by several bowling lanes on their contractual obligations with Pacific. Also, much of Pacific's inventory in late 1964 was out of date and salable at below cost or not at all. On or about January 1, 1965, an attorney was retained to work out a financial arrangement with Pacific's creditors. When the attorney was retained Powell had expectations that the creditor arrangements would be satisfactory and that as a result Pacific would continue in operation. On February 1, 1965, an unsecured creditor commenced suit in the Supreme Court of the State of Washington, King County, against Pacific. On April 12, 1965, Pacific filed an amended plan of arrangement which was accepted by a majority of the creditors on June 4, 1965. On June 22, 1965, a petition in bankruptcy was filed against Pacific. On September 30, 1965, the United States District Court for the Western District of Washington found that Pacific had not committed any act of bankruptcy and entered an order dismissing the petition. The decision was affirmed on March 25, 1968, by the United States Court of Appeals for the Ninth Circuit. See*248 Stearns & Foster Co. v. Pacific Bowling & Billiard Co., 391 F. 2d 750 (1968). The purpose for having Pacific file a plan of arrangement was so the corporation could continue its operations on a profitable basis. The general ledger "Loans Payable - Powell White" account of Pacific reflects the following from January 1, 1964 to December 31, 1965. The postings to the ledger were made quarterly. Due to Powell 1-1-64… $31,987.68 Repayments by *l02*Loans by PowellPrcific3-31-64$ 194.00$ 5,993.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,833.12309.009-30-641,097.00012-31-6416,975.0031,204.623-31-65300.001,800.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,950.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,552.741,412.0012-31-65 1,000.004,673.00$60,951.86$48,342.21BalanceDuePowell 12-31-65$44,597.33 Powell had expectations when he made these loans to the corporation that they would be repaid. On Schedule D of Powell and Lucille's 1964 joint income tax return, signed and dated April 15, 1965, they reported a longterm capital loss from the sale of the Pacific stock. The transaction was reported as follows: Pacific Bowling &Billiard CoSales Price - 1964$ 1,949.00Cost or Basis - 1946 43,100.00Gain or (Loss)($41,151.00)*249 In his notice of deficiency to Powell and Lucille respondent disallowed this claimed loss and stated: (b) As it is determined that capital gains are incorrectly stated on your return adjustments are made as follows: Summary:(1) Pacific Bowling and Billiard stock$41,151.00(2) Lakewood Lanes, Inc(964.52)(3) Installment sale 1,297.53Net increase to capital gains $41,484.01 (1) The deduction of $41,151.00 claimed as a loss resulting from the capital stock of Pacific Bowling and Billiard Company claimed as worthless, is not allowed because you have failed to establish that such stock became worthless within the taxable year. 594 Opinion Powell entered into an agreement on November 17, 1964, to sell the stock of Pacific to Fredric. The stock was placed in escrow and Fredric on or after November 17, 1964, assumed control and operation of Pacific. The purchase price for the stock was never paid by Fredric, and Powell never made demand for payment. Additional conditions contained in the November 17, 1964, agreement were never performed and sometime in December of 1964 Fredric abandoned the business. In September of 1965 the escrow agent was authorized*250 in a letter signed by Fredric, Powell and Powell's wife, Lucille, to release the stock in Pacific to Lucille. In their joint income tax return for the calendar year 1964 Powell and Lucille claimed a long-term capital loss arising from the difference between their basis in the stock of Pacific and the sales price under the November 17, 1964, agreement. They argue that they properly reported a long-term capital loss; that the execution of the November 17 agreement constituted a "sale or other disposition of property;" within the definition of section 1001(a) of the Code, and that the agreement was fully performed by the petitioners and partially performed by Fredric. Various factors have been considered in determining whether a "sale or other disposition of property" has occurred as of a particular time. These include: (1) whether title to the property has passed, Commissioner v. Segall, 114 F. 2d 706, 709 (C.A. 6, 1940); (2) whether the transferee has obtained possession of the property, Floyd R. Clodfelter, 48 T.C. 694, 701 (1967); (3) whether the sale price*251 of the property is definitely fixed, Floyd R. Clodfelter, supra; (4) whether there has been a significant amount of the agreed price paid, W.H. Hay 25 B.T.A. 96, 101 (1932); (5) the intention of the parties, Ted F. Merrill, 40 T.C. 66, 74 (1963), affirmed per curiam 336 F. 2d 771 (C.A. 9, 1964); (6) descriptive terms utilized in the agreement such as buyer or seller, Floyd R. Clodfelter, supra; and (7) whether an effective date has been agreed upon fixing a specific time for recognition of the rights and obligations of the parties, Floyd R. Clodfelter, supra. These factors point to a time when the burden and benefits or incidents of ownership were acquired such that a "sale or other disposition" may be considered to have occurred, Ted F. Merrill, supra at 74; but the absence of any one does not necessarily preclude a holding that a "sale or other disposition" is present. Above all, "the transaction must be viewed as a whole in the light of realism and practicality." Commissioner v. Segall, supra at 709. It is well settled that *252 retention of title alone, as is the case in conditional sales contracts, does not preclude an "other disposition." As was stated in Floyd R. Clodfelter, supra at 700: The seller's retention of title under a conditional sale contract until all deferred payments have been received, does not prevent the sale from being a closed transaction in respect of which gain or loss is to be determined under the above-mentioned statutory scheme. Such retention of title is merely for security purposes; and the security thus provided for the seller is comparable to that which he would have acquired if he had first transferred the title to the purchaser and had then simultaneously reacquired the same for security purposes, through a mortgage from the purchaser. These two methods of providing security for deferred payments are treated alike for income tax purposes, since they have identical objectives and effects. J. W. McWilliams, 15 B.T.A. 329, 342-343; and United States v. Marshall, 357 F. 2d 294, 295 (C.A. 9, 1966). See also Bogert, "Commentaries on Conditional Sales," 2A Uniform Laws Ann., sec. 9, pp. *253 8-9. Cf. also Pacheco Creek Orchard Co., 12 B.T.A. 1358 (1928); Pacific Coast Redwood Co., 5 B.T.A. 423 (1926); J. T. Pittard, 5 B.T.A. 929 (1926). The question in the instant case does not, therefore, turn solely on petitioners' retention of title in the stock but on whether said retention was merely a security device or was, a practical matter, indicative of the lack of any "sale or other disposition" when all of the other facts of this case are considered. We think that a consideration of all the facts here clearly points to a holding that the latter is the case. Under the agreement, the transfer of title to the stock, as well as the completion of the "sale," was dependent on the occurrence of several conditions. Petitioners were to retain title until such time as the conditions occurred and, if the conditions did not 595 occur, the agreement was to "cease and terminate with all rights of the parties hereto immediately terminated." As part of the conditions, Fredric promised under clause 4 of the agreement to utilize his "best efforts" to see that all loans from North West Bank to Pacific were paid or reduced to a point that the*254 bank would release the Whites from their personal guaranties on the loans. Notes payable to the bank, as indicated on Pacific's financial report dated June 30, 1964, amounted to $127,395.55, and petitioners' net worth statement, dated June 30, 1964, indicates that the guaranties were in this same amount. Pacific's financial report, dated December 31, 1964, showed that the loans had been reduced to $88,581.39. Fredric also promised, pursuant to clause 4, to utilize his best efforts to have the corporation acknowledge certain debts to petitioners. These debts were evidenced by two promissory notes, one dated April 4, 1964, in the amount of $25,553.31, and the other dated June 30, 1964, in the amount of $27,158.90. Further, the $25,553.31 loan was to be paid in full by transferring to petitioners various personal assets of the corporation, comprising all the corporate inventory, its car, posting machine and a non-competition agreement between Pacific and Walter Bardy. The other loan was payable on demand but was to bear no interest for two years. While Fredric was only obligated to utilize his best efforts to see that the above loans to Pacific from petitioners and the bank loans*255 were paid, it is readily apparent, upon examination of the escrow agreement, that these events had to actually occur if title to the stock was to pass and the agreement be completed. The letter establishing the escrow, dated November 23, 1964, in effect informed the bank that before the stock was to pass to Fredric, petitioners' loans had to be repaid and the bank must have released them from their liability on the bank notes. The latter requirement was but another form of requiring that the corporate loans by the bank be repaid, since the bank in all probability would not release the guarantor until the loans were paid. A careful examination of clause 4 and 5 of the agreement also leads to the same conclusion that there was no intention that Fredric receive title to the stock or that the agreement be complete until the abovementioned events had occurred, whether or not Fredric used his best efforts. Clause 4 states at the end: Purchaser shall not incur any personal responsibility for failure of Corporation to fulfill and perform the items set forth above, but shall exercise its best efforts to cause it to do this. At such time as the above conditions have been fulfilled, and the*256 purchase price for the stock has been paid to Seller, the stock shall be released from the escrow deposit with North West Bank and delivered to Purchaser. The phrase "above conditions," taken in context, refers to conditions (a) through (d) in clause 4, not to purchaser's best efforts to accomplish items (a) through (d). Clause 5 points out further that if the conditions of clause 4 were not fulfilled, petitioners, within what they in their sole discretion determined to be a reasonable time, could demand that the corporation pay the loans to the bank and the petitioners and that the "purchase price" of the stock be paid to them. If this were not done, then the agreement terminated. These demands are the same as items (a) through (d) of clause 4. It is illogical to presume that petitioners would demand less than Fredric was required to do to complete the contract. While he need only utilize his best efforts, if he failed to accomplish the required results, the contract terminated. Of course, he incurred no personal liability for such failure under clause 4. It is clear from the above that several significant events had to occur before title was to pass and the transaction be complete. *257 The probability of such events occurring under Fredric's management, moreover, was highly speculative and at the very best a long time from materializing. The corporation itself was in poor financial shape. As of June 30, 1964, the Shareholders' Equity was $60,250.71. For the following six months of operation, Pacific had a net loss and Shareholders' Equity, as of December 31, 1964, showed a deficit of $34,384.67. The losses were the result of various bowling lanes defaulting on their contracts with Pacific, and the fact that much of Pacific's inventory was unsalable or salable only at large losses. The financial condition of the bowling business throughout the country, moreover, was on a decline. The business in the last six months of 1964, as Lucille stated, was "unsuccessful," and we do not think that prosperity was just around the corner. Under the above financial circumstances, Fredric, who had no experience in the bowling field, and his staff, of whom we 596 know little, took charge. There is no indication in the record that Fredric had any financial resources to sink more funds into the corporation in order to keep it above water and eventually put it back on its feet*258 so that it could repay the loans (as Powell apparently did after Fredric abandoned the business). At the same time, the corporation gave a bill of sale to petitioners for all its inventory, its truck and its non-competition agreement. Whether or not these transfers were valid, the mere fact that the intention was to divest the corporation of what we can only surmise to be most of its "operating" assets and leave it in the hands of someone who did not seem experienced, makes the "sale" highly suspicious. At any rate, realistically and practically, the whole transaction was contingent on the future success of a business in serious financial shape under the regime of a man who was inexperienced; who, as the agreement states, was not personally liable if the conditions were not fulfilled; and who, in Powell's understanding, could not be sued under the agreement. In substance, we cannot view the date of the agreement in any realistic sense making Fredric an owner of stock, in light of the speculative and conditional nature of the agreement and the circumstances. Factors other than the above also confirm such a belief. The time in the future for title to pass was uncertain and fraught*259 with the possibility that petitioners would demand action on the conditions after a "reasonable" time and cause the termination of the agreement if the conditions were not fulfilled. While Fredric was in control of the corporation, such control seems somewhat inconsequential when viewed in light of the fact that many corporate assets were gone and the corporation was in bad financial shape. He had, to be sure, an "irrevocable" proxy, but its "irrevocability" lasted only so long as the agreement did not terminate. Finally, Fredric never paid any cash for the stock. While Powell contended at trial that a note was given by Fredric for the stock price, it was not put in evidence and we are not convinced it ever existed. In substance and effect, this agreement was no more in consequence than an option to purchase the stock. Petitioners were to be paid so much for the stock. Certain other conditions concerning the repayment of loans had to be fulfilled if the transaction was to be complete. Since Fredric was to incur no liability if the loans were not repaid, he was virtually a free agent, other than perhaps for the fact that he was under a nebulous duty to exercise some "best efforts. *260 " For all practical purposes, the success or failure of the conditions was up to him. He could repay the loans out of his own pocket if he wished, presuming he had the money, even if the business was not immediately successful. The situation was no more than if he was given a reasonable time (before petitioners made a demand) to see how successfully he could make a go of the enterprise. If his efforts were not enough, or he was not willing to invest by paying the loans off, after seeing how the business was shaping up, he lost nothing. Fredric abandoned the business in December and as of that time it was clear that the "option" would never be exercised. We can only suppose "market conditions" made a purchase unprofitable. After a consideration of the facts and remembering that it was the burden of petitioners to show that a "sale or other disposition occurred," we hold that, as of the date of the agreement, there was no "sale or other disposition." Moreover, we think it clear that in December of 1964, after Fredric abandoned Pacific, he had no intention of performing any part of the agreement and, under paragraph 5 of the agreement, the agreement itself was effectively canceled and*261 all rights of the parties therein were terminated. Although paragraph 5 required Powell to give written notice to Fredric, we think that this was unnecessary since the law does not require a useless act. The parties' subsequent letter (dated August 31, 1965), releasing the stock from escrow, stated what was already an accomplished fact in December of 1964. It was stated therein that "by mutual agreement and without recourse for either party, our agreement has been terminated." Thus, under the above facts, we hold that no "sale or other disposition" took place in 1964. Petitioners argue in the alternative that their stock in Pacific became worthless in 1964. A deduction is allowed for a security which is either a capital asset or one which is not a capital asset if it becomes worthless during the taxable year. See section 165 (g); section 1.165-5(b), Income Tax Regs. "In either case, the security must be shown to have become 'wholly worthless' during the taxable year." Charles W. Steadman, 597 50 T.C. 369, 376 (1968), affd. - F. 2d - (C.A. 6, *262 Apr. 10, 1970). More than liquidating or book value is required to demonstrate worthlessness of stock, however. The immediate realities, realizations and reasonable expectations must be considered. We think that, despite the passage of over three decades, the standards so clearly and concisely set forth in Sterling Morton, 38 B.T.A. 1270, 1278-1279 (1938), best explain and delineate what is required to sustain a worthless stock loss: From an examination of these cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely*263 to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes, because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which*264 puts an end to such hope and expectation. Applying the above tests to the facts of the instant case, we must uphold respondent's determination. Even assuming that the unaudited year-end financial statement at June 30, 1964, and the unaudited interim statement at December 31, 1964, were correct, petitioners have failed to demonstrate the loss of potential value. Throughout 1964 and 1965 petitioners' actions were consistent with the belief that the stock of Pacific had potential value at December 31, 1964. Loans were made by Powell during every quarter of 1964 and in all but one quarter of 1965. Pacific successfully worked out an arrangement with its creditors and in fact successfully resisted an involuntary bankruptcy action. Powell testified that he hoped to pay creditors and continue on a solvent basis. Moreover, Powell testified that he expected to be repaid for the loans he made to Pacific. In addition and notwithstanding all of the above, which we believe is more than sufficient to uphold respondent's determination, the record in the instant case is replete with evidence demonstrating that Powell's actions were entirely inconsistent with the belief that the stock of Pacific*265 was worthless. In fact due to Powell's efforts, Pacific did show a net profit from operations for the fiscal years ending June 30, 1966, 1967, and 1968. Accordingly, Decision will be entered for the respondent.